UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10-28-13
```

ENZO BIOCHEM, INC., *et al.*,

                  Plaintiffs,

-v-

PERKINELMER, INC., *et al.*,

                  Defendants.

No. 03 Civ. 3817 (RJS)
MEMORANDUM & ORDER

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Enzo Biochem, Inc. and Enzo Life Sciences, Inc. (collectively, "Enzo") bring this action against Defendants PerkinElmer, Inc. and PerkinElmer Life Sciences, Inc. (collectively, "PerkinElmer") for breach of contract, patent infringement, fraudulent inducement, and tortious interference with business relations.[1] Now before the Court is PerkinElmer's motion for summary judgment on these claims. For the reasons set forth below, the Court denies the motion in part and grants it in part.

I. BACKGROUND

A. Facts[2]

This case implicates two agreements between Enzo and PerkinElmer, both of which became effective on January 1, 1999.[3] (Decl. of John J. Elliott, dated May 1, 2013, Doc. No. 105 ("Elliott Decl."), Ex. 2 at 1, 6; *id.* Ex. 3 ("DA") at 1, 18). The first is a settlement agreement (the

---

[1] Enzo also alleged unfair competition under state law and the Lanham Act but withdrew those claims in its opposition brief ("Opp."). (Opp. at 1 n.1.)

[2] The following facts are taken from the parties' Rule 56.1 Statements and the exhibits and declarations attached thereto. In deciding this motion, the Court also considered PerkinElmer's brief in support of the motion ("Mem."), Enzo's opposition, and PerkinElmer's reply.

[3] The parties alternately use the names "PerkinElmer" and "NEN" to refer to the same entity because NEN Life Sciences was acquired by PerkinElmer on an unspecified date in 2000. (*See* Mem. at 2 n.2; Opp. at 1 n.2.) The Court uses only the name of NEN's successor, PerkinElmer.

"Settlement Agreement"), signed on December 22, 1998, in which PerkinElmer stipulated as to the validity of Enzo's patents and represented that it would refrain from infringing those patents and work to prevent third parties from infringing them. (*See id.* Ex. 2.) The second is a distribution agreement (the "Distribution Agreement"), signed on December 22, 1998 and January 7, 1999 by Enzo and PerkinElmer, respectively, under which PerkinElmer would sell and distribute certain products (the "Products") covered by Enzo patents and listed in Exhibits B and C to the Distribution Agreement, and PerkinElmer would pay Enzo a portion of the revenues from those sales and distributions. (DA § 1; *id.* at Exs. B, C.) The Distribution Agreement set forth the percentage of revenues that PerkinElmer would pay to Enzo for sales and distributions of Products. (*Id.* at Ex. H.) It also included language limiting Product sales to "Research End-users" in the "Research Market." (*Id.* at 4.) These restrictions and their effect are discussed in more detail below.

### B. Procedural History

Enzo commenced this action by filing the Complaint ("Compl.") on May 28, 2003. (Doc. No. 1.) The case was originally assigned to the Honorable John E. Sprizzo, District Judge, but after he passed away in December 2008, the case was reassigned to my docket on January 8, 2009. (Doc. No. 38.) From March 13, 2009 until August 25, 2011, this action was stayed while a related case was appealed to the Federal Circuit. (Doc. Nos. 43, 65–66.) On September 24, 2012, following a renewed round of briefing by PerkinElmer and defendants in related cases, the Court granted in part and denied in part PerkinElmer's motion for summary judgment with respect to multiple patent claims asserted by Enzo. (Doc. No. 82.)

PerkinElmer filed the instant motion for summary judgment on April 11, 2013, focusing on Enzo's non-patent claims and asserting a contractual basis for dismissing Enzo's remaining

patent claims. (Doc. No. 100). After receiving leave to take additional discovery ahead of PerkinElmer's motion, Enzo filed its opposition on May 2, 2013. (Doc. No. 104.) PerkinElmer replied on May 16, 2013 (Doc. No. 109), and the Court heard oral argument on the motion on September 27, 2013 ("Tr.").

## II. DISCUSSION

Pursuant to Federal Rule of Civil Procedure 56(a), a court may not grant a motion for summary judgment unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[I]f there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (citation and quotation marks omitted). PerkinElmer seeks summary judgment with respect to Enzo's claims for breach of contract, patent infringement, fraudulent inducement, and tortious interference with business relations. The Court will address each in turn.

### A. Breach of the Distribution Agreement

PerkinElmer takes issue with three breach-of-contract claims alleged in the Complaint: that PerkinElmer (1) sold Products for purposes that violated the use restrictions of the Distribution Agreement; (2) tendered insufficient payment to Enzo for Products that PerkinElmer sold under the Distribution Agreement; and (3) evaded payments to Enzo by selling component Products in a piecemeal fashion rather than as kit Products that, under the Distribution Agreement, would entitle Enzo to higher payments than it received for component Products. (Compl. ¶ 58(c)–(d), (f).)[4] PerkinElmer also argues that Enzo's remaining patent claims should

---

[4] Enzo pled two other breaches that PerkinElmer has not addressed in the motion for summary judgment: breach of the Distribution Agreement's labeling requirements (Compl. ¶ 58(e)–(f)) and breach of the Settlement Agreement

3

be dismissed because any allegedly infringing conduct was licensed by the terms of the Distribution Agreement.

### 1. Use Restrictions

Enzo alleges that PerkinElmer sold and distributed Products in violation of several of the Distribution Agreement's explicit research-only restrictions (Compl. ¶ 58(c)) and failed to exercise its best efforts to ensure the compliance of buyers and sub-distributors with those requirements (Compl. ¶ 58(f)). The Distribution Agreement limited PerkinElmer's sales of Products "to the Research Market for use by the Research End-User" and required PerkinElmer to "exert its best efforts to comply with the [use-restrictions] and to prevent commercial development or exploitation of the [Products] sold and shipped to others, and to give [Enzo] timely notice of any" deviations from the use restrictions. (DA §§ 1, 13.) However, the Distribution Agreement does not offer much guidance with respect to these restrictions. In particular, it circularly defines the *Research Market* to be "the research field," and a *Research End-user* to be "an end-user in the Research Market or an entity acting on behalf of an end-user in the Research Market." (*Id.* at 3.) Critically, the Distribution Agreement never clarifies whether the Research Market included applied research or only pure research or some sort of middle ground between the two. Accordingly, although sales to commercial research end-users were permitted under the Distribution Agreement (*id.* § 1(i)), the Court cannot conclude as a matter of law that PerkinElmer did not breach the Distribution Agreement when its buyers and sub-distributors used or sold Products for purposes tied to commerce (*see, e.g.*, Elliott Decl. Ex. 8 at 149:25–150:10 (acknowledging sales to Molecular Probes, Inc., for drug development); *see also id.* Ex. 74 (PerkinElmer blessing research for product-development purposes); *id.* Ex. 31

---

(Compl. ¶¶ 59–61). Because PerkinElmer has not moved for summary judgment as to these claims, they are live issues for trial.

4

(documenting PerkinElmer sales to, among others, Abbott Labs, AstraZeneca, Bayer, Bristol-Myers Squibb, Eli Lilly, Genentech, GlaxoSmithKline, Merck, Motorola, Pfizer, Quest Diagnostics, Roche, Sanofi Aventis, Schering, and Wyeth)). Given the ambiguity of the use restrictions in the Distribution Agreement, that question is for the jury to decide. *See Bank of Am. Nat'l Trust & Savings Assn. v. Gillaizeau*, 766 F.2d 709, 715 (2d Cir. 1985) ("Where contract language is ambiguous, the differing interpretations of the contract present a triable issue of fact.").

In support of its position that the Distribution Agreement permitted research tied to commerce, PerkinElmer points out that the Distribution Agreement required notice to Enzo of customers "who are commercial entities and who order any of the [Products]." (DA § 1(i).) PerkinElmer insists that this is clear evidence that the Distribution Agreement was not limited to research use. (*See, e.g.*, Tr. at 10:11–14 (referring to DA § 1(i)).) However, the parties do not dispute that commercial entities can and often do confine their work to research. (Tr. at 10:9–23, 25:7–10, 28:16–29:9.) The question is what kind of research – pure or applied – the Distribution Agreement permits, and the Court fails to see how the Distribution Agreement's single reference to "commercial entities" conclusively resolves this question in PerkinElmer's favor.

2. Insufficient Payment

Enzo also alleges that PerkinElmer breached the Distribution Agreement by failing to remit required payments to Enzo for sales of covered Products. (Compl. ¶ 58(d)(i).) Under the Distribution Agreement, if PerkinElmer's sales of Products crossed certain thresholds, it was entitled to discounts that correspond with those thresholds. The discount table provided a discount rate of .350 for sales of $1,500,000 and below, increasing to .400 for sales of $1,500,001–$2,225,000, and then increasing to .450 for sales of $2,225,001–$3,000,000, and so

on. (Elliott Decl. Ex. 3 at Ex. H.) PerkinElmer applied the highest achieved discount to all of its sales, which comports with the agreement's link between "*total* annual Product retail sales" and the applicable "Product discount." (*Id.* (emphasis added).) However, given that the table also lists the Product sales in bracketed ranges rather than by mere thresholds, the Distribution Agreement could reasonably be interpreted to apply a stepped discount – that is, for every dollar of sales below $1,500,001, only the .350 discount rate applies, but then any dollar of sales between $1,500,000 and $2,225,001 receives a .400 discount rate, and so on. Given the ambiguous language of the contract, resolution of its meaning must be left to the fact finder's judgment of the parties' intent based on extrinsic evidence; thus, the Court cannot grant summary judgment in PerkinElmer's favor. *Gillaizeau*, 766 F.2d at 715.

### 3. Piecemeal Sales of Kits

In its third breach-of-contract claim, Enzo alleges that, rather than selling "kits" listed as Products in the Distribution Agreement, PerkinElmer sold individual Enzo Product components accompanied by PerkinElmer's own products, thereby creating an ersatz kit. Enzo contends that, by doing so, PerkinElmer avoided higher, full-kit payments to Enzo under the Distribution Agreement, and that this effort to avoid payments to Enzo breached the covenant of good faith and fair dealing. (Compl. ¶ 58(d)(ii); Opp. 20–21.)

An implied covenant of good faith and fair dealing is incorporated into every contract, and it "'precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement.'" *Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.*, No. 08 Civ. 4341 (RJS), 2009 WL 1054830, at *5 (S.D.N.Y. Apr. 17, 2009) (quoting *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989)). To breach that duty is to breach the contract. *Boart Longyear Ltd. v. Alliance Indus. Inc.*, 869 F. Supp. 2d 407, 413 (S.D.N.Y. 2012). Enzo has

6

produced evidence that supports the existence of a scheme to deprive Enzo of full-kit royalties in contravention of the Distribution Agreement. (Elliott Decl. Exs. 39–42 (e-mails demonstrating PerkinElmer's efforts to sidestep kit-Product sales under the Distribution Agreement.) The record therefore presents a question of fact for the jury as to whether PerkinElmer's conduct breached the duty of good faith and fair dealing. *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) ("[W]hether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts . . . and is ordinarily a question of fact to be determined by the jury . . . .").

\* \* \*

A final note with respect to Enzo's patent-infringement claims: PerkinElmer asserts that the Distribution Agreement insulates it from those claims. That is, PerkinElmer contends it was licensed under the Distribution Agreement to manufacture, distribute, and sell the allegedly infringing products, and that this license thereby immunizes PerkinElmer against claims of patent infringement. If PerkinElmer did not breach the Distribution Agreement, it may well be immunized, but because the Court cannot conclude as a matter of law that PerkinElmer's activities fell within the scope of the Distribution Agreement, those activities might not fall under the protection of the license granted by the Distribution Agreement. Accordingly, the Court cannot grant summary judgment as to the remaining patent claims.

### 4. Enzo's New Contract Theories

In its opposition brief, Enzo raises four new breach-of-contract claims that were not alleged in the Complaint. Specifically, Enzo asserts that PerkinElmer breached the Distribution Agreement by (1) manufacturing Products after Enzo terminated PerkinElmer's interim manufacturing license; (2) selling non-Product acycloNTPs instead of comparable Products;

(3) failing to pay a "transfer fee" to Enzo for Products sold at prices exceeding the price in the Distribution Agreement; and (4) violating the Distribution Agreement between January 1 and August 28, 2005 – a period roughly two years after Enzo commenced this action. Enzo effectively seeks to amend its ten-year-old Complaint by raising these new claims in its summary judgment brief. (Opp. at 15–21.) Although a district court should grant leave to amend a complaint to add new claims "freely . . . where justice so requires," Fed. R. Civ. P. 15(a), and although "mere delay" in amending is not, of itself, sufficient to justify denial of a party's motion to amend, *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987), "at some point . . . [,] the pleadings will be fixed," *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000) (quoting the advisory committee's note to Rule 16). Here, Enzo has failed to amend or to seek leave to amend during the eight years since its most recent new claim accrued, and it has not demonstrated good cause for an amendment now. Therefore, the Court will not entertain an amendment to the pleadings at this late date, *see id.*; *see also Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 460, 462 (S.D.N.Y. 2007) ("This Circuit has consistently found prejudice and denied amendments where discovery has already been completed."), particularly because these new claims are raised in briefing papers for a summary judgment motion, *see Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 170 F.R.D. 111, 119 (S.D.N.Y. 1997) ("[I]t is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment."). The Court also notes that, for at least six years, Enzo has been on notice that it would not be permitted to add new, unpleaded claims into this action by sprinkling them into its briefing papers. Judge Sprizzo warned Enzo in 2007: "It's not what you argue[;] it's what's in your complaint." (Tr. of July 18, 2007 Conference at 312:17–18.) Indeed, he put a fine point on the very issue of adding new breach theories, stating that Enzo's "[p]leading[s] set

forth [its] claim," and that Enzo would not be permitted to plead a specific breach of contract "and then [to] argue every possible breach of contract [it could] think of . . . ." (*Id.* at 281:10–13.) Instead, Judge Sprizzo reminded Enzo that it had "to describe with some specificity the kind of claim [it was] asserting. . . . Otherwise, [there would be] no purpose to seek leave to amend if you could just amend willy nilly . . . ." (*Id.* at 281:25–282:2)

Because the four newly asserted contract claims at issue here were not alleged in the Complaint, they are not properly before the Court and may not be presented at trial.

### B. Fraudulent Inducement

Enzo next claims that PerkinElmer fraudulently induced Enzo to enter into the Distribution Agreement by representing in the separate Settlement Agreement that it would honor Enzo's patents. (Compl. ¶¶ 96–97; Opp. at 23–24.) A claim for fraudulent inducement requires "(i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by [the defendant]; and (iv) resulting damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 143 (2d Cir. 2011) (citation omitted). Here, the record reflects that PerkinElmer stipulated in the Settlement Agreement that Enzo's patents were "valid and enforceable" and that Enzo's patents dominated PerkinElmer's. (Elliott Decl. Ex. 2 ¶¶ 1–2.) PerkinElmer also agreed to "use its best efforts not to infringe Enzo's patents" and to "provide assistance to Enzo in support of its efforts to enforce its patents against infringers." (*Id.* Ex. 2 ¶¶ 6–7.) Moreover, representatives of PerkinElmer have acknowledged that (1) PerkinElmer made those stipulations and agreements because there "had been a disagreement between the companies for several years, and [PerkinElmer] wanted to put the issue behind [it] so that [it] could get on with selling the company" (*see, e.g., id.* Ex. 20 at 22:12–23:21), and (2) it did not necessarily believe that its stipulations were accurate (*see, e.g.,*

9

*id.* Ex. 20 at 180:11–184:14). Enzo asserts that it entered the Distribution Agreement in reliance on PerkinElmer's representations in the Settlement Agreement and thus, when PerkinElmer agreed to the Settlement Agreement with no intention of abiding by its terms, PerkinElmer fraudulently induced Enzo's assent to the Distribution Agreement. (Opp. at 22–23.)

The critical question raised by this claim is whether the two agreements – the Settlement Agreement and the Distribution Agreement – are separate and distinct or parts of a single, integrated contract. Under New York law, "where a fraud claim 'is premised upon an alleged breach of [contract] and the supporting allegations do not concern representations which are *collateral or extraneous* to the [contract], a cause of action sounding in fraud does not lie.'" *Bridgestone/Firestone, Inc. v. Recovery Credit Svcs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (emphasis added) (quoting *McKerin v. Fanny Farmer Candy Shops, Inc.*, 574 N.Y.S.2d 58, 59 (App. Div. 1991)). Put another way, a claim for fraudulent inducement does not arise simply because a party entered into a contract while simultaneously intending to breach it. *See 767 Third Ave. LLC v. Greble & Finger, LLP*, 778 N.Y.S.2d 157, 158 (2004) ("It is well settled that a cause of action for fraud does not arise where the only fraud alleged merely relates to a party's alleged intent to breach a contractual obligation.") Therefore, if the two agreements here are part of a single contract, Enzo's claim fails. Unsurprisingly, PerkinElmer contends that the two agreements are part of a single whole (Mem. at 17–18), while Enzo counters that it was fraudulently induced to sign the Distribution Agreement based on PerkinElmer's *separate* representations in the Settlement Agreement (Opp. at 24–25). "'In determining whether contracts are separable or entire, the primary standard is the intent manifested, viewed in the surrounding circumstances.'" *Nat'l Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 204 (2d Cir. 1989) (quoting *Rudman v. Cowles Commc'ns*, 330 N.Y.S.2d 33, 42 (1972)). "While a party's

intent is typically a question of fact for the jury, the question is a matter of law for the court if the documents reflect no ambiguity as to whether they should be read as a single contract." *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 03 Civ. 8843 (LAP)(RME), 2010 WL 3155176, at *15 (S.D.N.Y. July 30, 2010) (citing *TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 89 (2d Cir. 2005)). Here, the Court concludes that the two agreements were part of one unified transaction. The Distribution Agreement acknowledged that the Settlement Agreement "satisfactorily resolved" outstanding infringement claims between Enzo and PerkinElmer. (DA § 4.) The Distribution Agreement also set forth how breach or rescission of that agreement would impact the Settlement Agreement. (*Id.*) For its part, the Settlement Agreement explained that "Enzo and [PerkinElmer had] undertaken to enter into an agreement to sell Enzo products for the research market to be separately executed by the parties under which [PerkinElmer would] become an authorized distributor of Enzo's products." (Elliot Decl. Ex 2 at 1.) The Settlement Agreement also referred to exhibits to the Distribution Agreement and set forth how breach or rescission of the Settlement Agreement would affect the Distribution Agreement and vice versa. (*Id.* Ex. 2 §§ 5, 9–11.) And tellingly, Enzo signed the two agreements the same day, December 22, 1998, and the agreements took effect the same day, January 1, 1999. (*Id.* Ex. 2 at 1, 6; DA at 1, 18.) These facts, taken together, lead to the conclusion that the Settlement Agreement and the Distribution Agreement should be read as one integrated contract. *See World Wide Polymers*, 2010 WL 3155176, at *15 ("Typically, instruments that are executed at substantially the same time and relate to the same subject matter are read together as one.") (citing *Nau v. Vulcan Rail & Contsr. Co.*, 36 N.E.2d 106, 110 (N.Y. 1941)); *see also Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 263 (2d Cir. 1965) ("[I]t is both

good sense and good law that these closely integrated and nearly contemporaneous documents be construed together." (quotation marks and citation omitted)).

The Court concludes that Enzo seeks to recover for fraudulent inducement based solely on evidence that PerkinElmer entered into the Settlement and Distribution Agreements while simultaneously intending to breach them. A claim for fraudulent inducement will not lie against a defendant who merely intended to breach the agreement when it entered the agreement. *Greble & Finger*, 778 N.Y.S.2d at 158. Therefore, the Court grants summary judgment in favor of PerkinElmer with respect to this claim.

### C. Tortious Interference with Business Relations

Lastly, Enzo asserts that PerkinElmer tortiously interfered in Enzo's business relationship with a third-party company, Li-Cor, by telling Li-Cor that Enzo's patents were invalid or did not cover products that PerkinElmer was seeking to market to Li-Cor. (Compl. ¶ 88; Opp. at 24 n.24; Enzo's Local Rule 56.1 Opp. Statement, Doc No. 102 ("Enzo 56.1 Stmt."), ¶ 25.)[5] A tortious interference claim requires a plaintiff to prove that: "(1) there [was] a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interfere[d] with it; (3) the defendant act[ed] with the sole purpose of harming the plaintiff, or, failing that level of malice, use[d] dishonest, unfair, or improper means; and (4) the relationship [was] injured." *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108–09 (2d Cir. 1997). However, nothing in Enzo's Rule 56.1 Statement points to record evidence of PerkinElmer derogating Enzo's patents, and Enzo's opposition brief devotes a single footnote to

---

[5] Although the facts alleged in the Complaint refer to a claim of tortious interference with an *existing* contract between Enzo and Li-Cor, Enzo has shifted its cause of action to tortious interference with *prospective* business relations. On this basis alone, the Court would be justified in dismissing the claim. *See supra* Section II.A.4. However, notwithstanding the substance of the factual allegations, the Complaint labeled this claim as one for interference with business relations rather than contract, and PerkinElmer briefed the claim as such, so the Court will consider the claim on its merits.

12

this claim. (Opp. at 24 n.24; Enzo 56.1 Stmt. ¶ 25; *see also* Tr. at 37:3–39:12 (admission by Enzo that "[a]ll that there is on the Li-Cor issue is a body of circumstantial evidence buttressed by slight pieces of documentary evidence that[,] remarkably[,] Li-Cor terminate[d] . . . and [went] into [an] arrangement with PerkinElmer for products . . . PerkinElmer had no right to make and sell under the [D]istribution [Agreement]"); Elliott Decl. Ex. 46 at 246:13–249:12 (deposition of Li-Cor representative with no recollection of PerkinElmer deriding Enzo patents); *id.* Ex. 47 (e-mail making no reference to the validity of Enzo's intellectual property).) Without some evidence supporting its theory of interference, Enzo has no means of proving either the second or third elements of this cause of action. Accordingly, the Court grants summary judgment for PerkinElmer on Enzo's tortious interference claim.

### III. CONCLUSION

For the reasons stated above, PerkinElmer's motion for summary judgment is granted only with respect to Enzo's claims for fraudulent inducement and tortious interference. In all other respects, the motion is denied. However, Enzo is precluded from asserting the new breach of contract theories asserted in its summary judgment brief. The Clerk of the Court is respectfully directed to terminate the motion pending at Doc. No. 100.

IT IS HEREBY ORDERED THAT this case will proceed to trial on January 13, 2014 at 9:30 a.m. in Courtroom 905 of the Thurgood Marshall United States Courthouse. IT IS FURTHER ORDERED THAT, by November 1, 2013, the parties shall submit a joint letter proposing a pretrial schedule, including discovery deadlines for the issue of damages.

SO ORDERED.

DATED:   October 28, 2013
         New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

13

\* \* \*

Enzo is represented by Michael Burrows, Scott J. Bornstein, Jeffrey R. Mann, Ronald D. Lefton, Richard C. Pettus, and Justin A. MacLean of Greenberg Traurig, LLP, 200 Park Avenue, New York, New York 10166, and Victor H. Polk, Jr. of Greenberg Traurig, LLP, One International Place, Boston, Massachusetts 02110.

PerkinElmer is represented by William G. McElwain of Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006, and Lisa J. Pirozzolo of Wilmer Cutler Pickering Hale and Dorr, LLP, 60 State Street, Boston, Massachusetts 02109.