

Jeffrey R. Mann
Tel (212) 801-2111
Fax (212) 224-6125
mannj@gtlaw.com

# MEMO ENDORSED

November 1, 2013

**BY E-MAIL**
**sullivansdnychambers@nysd.uscourts.gov**

Honorable Richard J. Sullivan
United States District Judge
United States District Court
Southern District of New York
500 Pearl St., Room 615
New York, NY 10007

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11-4-13
```

Re: *Enzo Biochem, Inc., et ano. v. PerkinElmer, Inc., et ano.*
03 Civ. 3817 (RJS)

Dear Judge Sullivan:

Pursuant to your Honor's Memorandum & Order (the "Order") filed October 29, 2013, this letter is submitted jointly on behalf of Enzo Biochem, Inc. and Enzo Diagnotiscs, Inc. (collectively "Enzo") and PerkinElmer, Inc. and PerkinElmer Life Sciences, Inc. (collectively "PerkinElmer") to address the pretrial schedule and the trial date of January 13, 2014.

On September 27, 2013, at the conclusion of the oral argument of PerkinElmer's summary judgment motion regarding Enzo's non-patent claims, after a brief discussion with counsel concerning a trial date, your Honor stated,

> "I will issue a ruling that gives greater guidance, and then probably at the end of that ruling I'll ask you to submit a joint letter with your proposals as to next steps, and then maybe you'll agree or disagree. We'll have some combination of those two things." (Tr. at 48)[1]

Since the receipt of the Order, counsel have been diligently working to devise a pretrial schedule covering all of the necessary and required steps to make this case ready for trial by the date Your Honor identified, January 13, 2014. Those steps include (i) damages discovery, all of which had been stayed, (ii) expert reports, discovery, and Daubert challenges, and (iii) the preparation of the pretrial order, jury instructions and motions *in limine*. The parties have conferred and have identified tasks to be completed as shown on the attached schedule. We have also discussed dates which we could insert

---

[1] A copy of the transcript of the oral argument on September 27, 2013 is enclosed with this letter.

if necessary to be ready for trial by January 13, 2014. The parties respectfully suggest, however, that it would be extremely difficult to accomplish these tasks prior to the scheduled trial date, particularly in light of the Thanksgiving, Christmas and New Year's holidays. Thus, Enzo requests a continuance of the trial date until March 1, 2014. PerkinElmer concurs in this request.

Independent of the reasons indicated above, PerkinElmer seeks a short continuance of the trial because of a conflict in the schedule of William McElwain, lead trial counsel for PerkinElmer. Mr. McElwain will be engaged in an arbitration proceeding in Zurich, Switzerland from January 9 to January 17, 2014 under the auspices of the World Intellectual Property Organization. The hearing for the arbitration was set in a procedural order dated January 22, 2013, prior to the status conference in which the Court suggested the possibility of a trial in January 2014 for one or more of the actions brought by Enzo. The arbitration involves three arbitrators and lawyers from five law firms and cannot realistically be rescheduled. Mr. McElwain is the sole lawyer at WilmerHale who has been involved in the defense of PerkinElmer since the action's inception, and PerkinElmer respectfully submits that it would be prejudiced in the presentation of its defense if he is not available to be present at trial. PerkinElmer therefore requests a continuance, at least to accommodate this conflict, which Enzo does not oppose.

Counsel are, of course, available at your Honor's convenience to discuss the trial setting and other pretrial matters.

Respectfully yours,

Jeffrey R. Mann

cc:   William McElwain, Esq. (with enclosures) (via email)
      Omar Khan, Esq. (with enclosures) (via email)

The parties' adjournment request is granted. Trial will commence on Tuesday, March 18, 2014 at 9:00 a.m. in Courtroom 905. The parties shall submit a proposed pre-trial schedule by November 8, 2013.

SO ORDERED
Dated: 11/4/13

RICHARD J. SULLIVAN
U.S.D.J.

# In The Matter Of:

*ENZO BIOCHEM, INC., et al., v*
*PERKINELMER, INC., et al.,*

*September 27, 2013*

**SOUTHERN DISTRICT REPORTERS**
*500 PEARL STREET*
*NEW YORK, NY 10007*
*212 805-0330*

Original File D9RJENZM.txt
**Min-U-Script® with Word Index**

**This Page Intentionally Left Blank**

**Page 1**

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   ENZO BIOCHEM, INC., et al.,
 4                    Plaintiffs,
 5              v.                          03 Civ. 3817 RJS
 6   PERKINELMER, INC., et al.,
 7                    Defendants.
 8   ------------------------------x
                                            September 27, 2013
                                                  3:05 p.m.

     Before:
                    HON. RICHARD J. SULLIVAN,
                                              District Judge
```

**Page 2**

1   (In open court)
2   (Case called)
3        THE COURT: We are here in connection with
4   Perkinelmer's motion for summary judgment on the non-patent
5   claims. So I have read the briefs, got all the attachments. I
6   think I understand it, although I understand there is some the
7   moving party has missed. That is why you're here to keep me
8   honest and sure. Since it is the defendant's motion, we'll
9   have them go first. I may interrupt a little here and there,
10  and after that who will argue?
11       MR. MANN: I will.
12       THE COURT: So then I will give you a chance to
13  respond, and then since it is your motion, Mr. McElwain, I will
14  have you back.
15       MR. McELWAIN: May I address you from the podium?
16       THE COURT: That is probably best over here. The
17  acoustics here are a little bit of a chance, so try to speak
18  slowly and distinctly just because things get -- the walls
19  just -- they're beautiful, but sound just bounces off them in
20  every direction.
21       MR. McELWAIN: I have a slide here, mostly just
22  excerpts from the contract, but will help us. Just to orient
23  ourselves, your Honor, the first page is a chronology. I
24  wanted to point out some things.
25       First of all, the contract we are here on today is

**Page 3**

1   primarily a distributorship agreement. The settlement
2   agreement was entered into at the same time in 1999 with a
3   breach of contract action, as I understand.
4        The settlement agreement was entered and
5   distributorship was entered into in 1999. Enzo first commenced
6   suit in 2002, and unusually neither party at that time took any
7   action to terminate the distributorship agreement even though
8   it could be terminated within six-month notice even without
9   cause.
10       The distributorship agreement continued during the
11  early pendency of this suit until 2004. The event that
12  occurred in 2004 was the expiration of the warrants which will
13  require the patents that dealt with the labeling of the base of
14  the nucleotide. When the lower patents expired, Perkinelmer
15  let the distributorship agreement expire, and then finally
16  factual discovery ended in 2005.
17       The second tier, your Honor, this case like the
18  Emerstadt case you heard of in August, presents an unfortunate
19  question of what claims are in the case and what claims are not
20  in the case. I have attempted to identify all the claims
21  discussed on the brief, and there are 14 of them. At two
22  minutes a shot, I don't think I would get through all of them.
23       On the left I have listed the claims that at least
24  from my standpoint seem to be pled in the complaint. On the
25  right I tell you what has happened to the claims that have been

**Page 4**

1   pled in the complaint and then list the additional claims.
2        THE COURT: I get that.
3        MR. McELWAIN: For our purposes, two claims have been
4   clearly withdrawn, the Lanham Act claim and unfair competition
5   claim.
6        THE COURT: Right.
7        MR. McELWAIN: Two other claims have been recast, and
8   one claim I don't know if it is in or not, tortious
9   interference. I will concentrate on the first three claims
10  which I say appear to have some grounding on the complaint. If
11  I have time, I will roll into the merits of the remaining
12  claims, or if your Honor has any questions.
13       THE COURT: Okay.
14       MR. McELWAIN: When I say the primary claim in the
15  case will be the one involving research use or restrictions,
16  that clearly is pled in the complaint, but I would say even
17  that claim has morphed substantially over the time period that
18  this case has been pending.
19       If I had to summarize the complaint, it was that
20  Perkinelmer, Orchid, MPI and Amersham together had engaged in
21  sales for non-research purposes. That is the thrust of the
22  complaint.
23       What those non-research purposes were, who the sales
24  were made to, were not identified in the complaint, so we
25  answer contention for factual discovery. You say we breached

| D9RJENZM | Motions | Page 5 |
|---|---|---|

1 the distributorship agreement, identified the provisions and
2 tell us what we did to breach them. Insofar as the research
3 restrictions are concerned, we got two answers back.
4     One was that Perkinelmer sold or is selling to Orchid
5 large quantities modified nucleotides covered by Enzo's patents
6 not listed in the distributorship agreement. The
7 distributorship agreement, as your Honor may note from the
8 papers, has as an exhibit, Exhibit C, and this is long list of
9 nucleotides. I understood the interrogatory answer to be
10 directed to a different type of claim which was the acyclo
11 terminated products, which your Honor will recall from the
12 patent decision, were not listed in Exhibit C.
13     As a result of your patent decision, they have been
14 found not to infringe, but back when Enzo served this
15 interrogatory they were saying the sale of those products
16 breached the distributorship agreement and they made also made
17 allegations against MPI. Those are the claims I attempted to
18 address in our papers, pointing out that there was no evidence
19 of any non-research sales or uses by Orchid and MPI and, in any
20 event, Perkinelmer wasn't a guarantor of the actions of its
21 distributors.
22     In response, Enzo came up with two arguments that at
23 least with respect to Perkinelmer are wholly new. They weren't
24 briefed in front of Judge Sprizzo. They weren't part of the
25 complaint. They weren't part of Enzo's answers to

| D9RJENZM | Motions | Page 6 |
|---|---|---|

1 interrogatories.
2     The first argument is that the distributorship
3 agreement prohibits sales to commercial profit entities. In
4 other words, the distributorship agreement is not simply one
5 that limits the uses to which customers can put products, but
6 limited identity of people to whom Perkinelmer could sell.
7 According to them, we could not sell to commercial profit
8 entities, with one minor exception which I will get to later.
9     The second point was not that they had any evidence of
10 our own non-research use of products or even of non-research
11 use of products by customers, but that we were vicariously
12 liable for any breaches of the distributors. That would be
13 MPI, Amersham and Orchid. These are the two arguments made in
14 the response not addressed in my opening brief because they had
15 never been raised. I will try to address them in the reply
16 brief and try to address it today.
17     First, we can blow through the next slides but orient
18 ourselves a little bit on key provisions. On Slide 5 is the
19 research restriction which prohibits the sale of products to --
20 which allows the sales of products to the research market for
21 research use only by the research end user and prohibits the
22 sale of products for therapeutic or diagnostic purposes and
23 also states not to be commercially developed or exploited.
24     MR. MANN: Forgive me. He skipped over Slide 4.
25     THE COURT: He can skip over where he wants.

| D9RJENZM | Motions | Page 7 |
|---|---|---|

1     MR. MANN: Where would you like me to lodge my
2 objection to this exhibit?
3     THE COURT: You're objecting to the exhibit?
4     MR. MANN: To Slide 4 which looks in the nature of a
5 supplemental reply brief. He is citing case authority and now
6 doing what I complained about Amersham doing. This is
7 supposedly a demonstrative exhibit. He introduced it by saying
8 it was largely excerpts from the complaint.
9     MR. McELWAIN: It is quotes from Enzo's brief, your
10 Honor.
11     MR. MANN: To the extent that this document provides
12 something other than what is traditionally expected in the
13 demonstrative, which I must tell you I haven't seen until just
14 now, I think it is objectionable.
15     THE COURT: All right. You're objecting to the
16 characterization of the current arguments?
17     MR. MANN: Sorry?
18     THE COURT: Page 4?
19     MR. MANN: On Page 4, there is an example. He is
20 using this as an opportunity to rehash the law on the subject.
21     THE COURT: You referred --
22     MR. McELWAIN: These are quotes I literally clipped
23 out of Enzo's brief.
24     MR. MANN: That is what a reply brief is for, your
25 Honor.

| D9RJENZM | Motions | Page 8 |
|---|---|---|

1     THE COURT: I think the first chronology, your
2 opposing that as well?
3     MR. MANN: No, of course not. I don't want to
4 interrupt Mr. McElwain as he argues. You understand the nature
5 of my complaint about this?
6     THE COURT: Yes. Go ahead.
7     MR. McELWAIN: To Slide 5 is the basic research use
8 restriction provision that the parties have been arguing about.
9     Slide 6 is what I think as the core duty on
10 Perkinelmer, which is the duty to label its products for
11 distribution and sale, advising customers of the research use
12 restrictions.
13     Slide 7 is a duty to inform Enzo if Perkinelmer has
14 any reason to believe there is a violation of the research use
15 restrictions.
16     Slide 8 deserves to be paused on. It imposes a
17 special duty on Perkinelmer with respect to commercial
18 customers, stating after the effective date of this agreement,
19 to inform in writing of any affiliates who are commercial
20 entities and in order any of the products of the notice given
21 in sub-restrictions G and H, the research use restrictions.
22     THE COURT: Right.
23     MR. McELWAIN: Then there is a requirement that Enzo
24 exercise its best efforts to comply with the agreement and
25 prevent commercial development by others.

Case 1:03-cv-03817-RJS   Document 120   Filed 11/04/13   Page 7 of 18

ENZO BIOCHEM, INC., et al., v
PERKINELMER, INC., et al.,
September 27, 2013

**D9RJENZM  Motions  Page 9**

1    Lastly, on Slide 10, your Honor, there is a very long
2 provision included here simply because it permits Enzo, if they
3 have reason to believe that distributors have engaged in any
4 infringing activities, gives Enzo the ability to ask the
5 distributors be removed from the authorized distribution list.
6    Moving to Slide 11 and characterizing Enzo's argument,
7 their commercial entity argument, as I understand it now,
8 appeared first in Dr. Rabbani's declaration filed in this
9 latest round of briefing. Dr. Rabbani is the CEO of Enzo.
10    In the briefing before Enzo, before Judge Sprizzo, he
11 filed a very lengthy affidavit. In the brief before your
12 Honor, he filed a supplemental declaration, and for the first
13 time Enzo advanced the theory that Perkinelmer could only sell
14 to commercial entities that were doing research services on
15 behalf of the end user in the research market. That is that
16 Perkinelmer could not sell to drug companies, could not sell to
17 other research companies, that the ability to sell to
18 commercial interests was extremely limited.
19    THE COURT: There is a research-only restriction that
20 is alleged in Paragraph 58 C, right?
21    MR. McELWAIN: Correct.
22    THE COURT: So they're saying there is a breach of
23 that provision by sales to folks who are not engaged in
24 research only. That is my understanding of what they're
25 saying. Is that different than your understanding?

**D9RJENZM  Motions  Page 10**

1    MR. McELWAIN: It is, your Honor, in the sense of the
2 research burden only is a paraphrase of the provision. If we
3 go back to Slide 5, it is all products sold or distributed by
4 Enzo for sale and distribution for the research market, for
5 research-use only by the research end user. Their argument, as
6 I understand it, is we could not sell to any commercial entity
7 that engaged in product development, a drug company being the
8 type of example.
9    Drug companies, obviously, engage in massive amounts
10 of research. These products are essentially research tools.
11 As I understand their argument, the idea we could not sell to
12 commercial entities at all is completely rebutted by Section 1
13 (i), shown on Page 8, in which specifically requires us to give
14 notice to commercial entities of the research restrictions.
15    I think the reason why you know that their argument
16 that our entitled commercial customers we can sell to is
17 limited if we can only sell to customers who did nothing but
18 research, there would have been no requirement on the labeling
19 at all. The reason we had to label was because we were going
20 to be selling to drug companies. Drug companies had to know
21 that when they got these products, they could use them for
22 research, but they could not use them, for example, to make a
23 diagnostic product or therapeutic product.
24    THE COURT: Isn't that for the jury to decide?
25    They're saying that the fact that you sold to these

**D9RJENZM  Motions  Page 11**

1 folks who are not physically engaged in research supports the
2 allegation that you breached the agreement. The agreement has
3 a research-only restriction. There were sales to lots of
4 entities that were not primarily researchers, and if the
5 defense will be well, they were, but they were using the
6 product only for research and not for other commercial
7 purposes, that is a defense at trial.
8    It is not clear to me why they had a cause of action
9 or why there is sufficient evidence in the record that would
10 allow them --
11    MR. McELWAIN: The only evidence they have in the
12 record is we sold, for example, to Pfizer.
13    THE COURT: Say that again.
14    MR. McELWAIN: The only evidence they have in the
15 record is we sold, for example, to a drug company like Pfizer.
16 Pfizer obviously sells drugs. Pfizer obviously engages in
17 research and development. They're the plaintiff here.
18    If they want to prove that there was a violation of
19 the research restrictions, at a minimum they have to come in
20 with someone from Pfizer saying yes, we used this as a
21 diagnostic product. We labeled the product appropriately with
22 labels saying you can only use this for research purposes.
23 That is the core obligation imposed on us.
24    There is no reason in the world to think that the
25 Pfizers of the world violated that restriction. One reason

**D9RJENZM  Motions  Page 12**

1 there is no reason to think that the Pfizers of the world
2 violated that restriction is because these products are
3 research tools. That is what people use them for.
4    I would say on summary judgment, your Honor,
5 absolutely they have to come in with some evidence that
6 somebody used this product for a non-research purpose. They
7 haven't done that and they can't do it because these are
8 research tools.
9    THE COURT: This is the deposition of, Page 149,
10 Exhibit 8 to Mr. Elliott's declaration. The question is:
11 "Q Were you aware that any of the products were being used for
12 drug discovery?
13 "A Yes.
14 "Q Were you aware that any were being used for drug
15 development?
16 "A Yes."
17    And the next question:
18 "Q Which of your customers used this products for their own
19 developments?"
20    And then I think there is disagreement what is
21 research and not research.
22    MR. McELWAIN: Your Honor, that is the core
23 contractual interpretation issue, not a dispute of fact, but an
24 issue of how you interpret this contract. Can you interpret
25 this contract as being limited to the research that academics

| D9RJENZM | Motions | Page 13 |

1  do, which I believe is perhaps Enzo's interpretation?
2      THE COURT: What are commercial purposes as you then
3  define that term?
4      MR. McELWAIN: The opposite of research. This is
5  belts and suspenders research.
6      THE COURT: The opposite of research?
7      MR. McELWAIN: Like lawyers draft contracts all the
8  time. It is a belts and suspenders definition of here's the
9  things you can do. You can sell it for research purposes and
10 you can't use it for any commercial purposes, which I think
11 would certainly include, in the case of non-distributors, you
12 can't resell the product I think is the primary point of the
13 commercial aspects of this.
14      The notion that a person sitting in a lab at Yale
15 University is engaged in research with that very same person
16 sitting in a lab at Pfizer is not engaged in research makes no
17 sense in light of the contract and the express indication in
18 the contract that Perkinelmer could sell to commercial
19 entities. Again, your Honor, if there was no ability at all to
20 sell to commercial entities, there would have been no reason to
21 require us to label the products.
22      THE COURT: I understand the argument, but I am not
23 sure it is as simple as you suggest. There are lots of
24 products that are labeled to be used for only specific use even
25 though they're providing supplies to a party that should be

| D9RJENZM | Motions | Page 14 |

1  only engaged in the specific use.
2      MR. McELWAIN: The way I would roll this back is to
3  think about it in terms of Perkinelmer and what is practical.
4  We have these products to distribute. We sold them literally
5  to thousands of customers, many of them academic institutions
6  and many of them commercial entities. We have the ability to
7  label the products, which we do. We have the ability to write
8  letters to the entities which the contract required us to do
9  and which we did.
10     We have no meaningful ability to know every use the
11 customer would make of the product. The question for the
12 breach of contract is what were our duties? Our duties were to
13 label products for research uses only.
14     THE COURT: You're saying that the duty is limited
15 simply to labeling?
16     MR. McELWAIN: I would say that is correct.
17     If we had a knowledge that someone was going to misuse
18 it, then that might be problematic, but it can't be that we
19 make an authorized sale and then the customer gets the product
20 and unknown to us misuses the product, and our sale all of a
21 sudden becomes a breach of contract. It is just not practical
22 from the standpoint of NEA and Perkinelmer. When they make the
23 sale, they have to have some knowledge whether this is an
24 appropriate sale.
25     THE COURT: It seems to me the distribution agreement,

| D9RJENZM | Motions | Page 15 |

1  the 1 (f) expressly references that you cannot make a sale to
2  anybody for commercial use or exploitation without express
3  written authorization of Enzo. Why do you need that if this is
4  just labeling?
5      MR. McELWAIN: The "for commercial use" is the antonym
6  of "not for research." I guess I don't understand how a
7  contract like this could work if our customers came in, we said
8  listen, customer, you have to use this for research, they say
9  fine, we are going to use it for research, and later they don't
10 use it for research, but that all of a sudden put us into a
11 breach of contract situation or patent infringement situation.
12     It is not a realistic way to interpret the contract,
13 in my view, particularly in light of the contract expressly
14 giving us the right to sell to commercial entities.
15     THE COURT: "Research market" and "research end-user"
16 are defined, right?
17     MR. McELWAIN: Not very helpfully. "Research market"
18 is defined as "research field," and then research end-user, I
19 think, is --
20     THE COURT: If it is not helpfully defined, then you
21 can argue the --
22     THE COURT: If it is ambiguous, then we are free to go
23 to extrinsic evidence what the parties intended.
24     MR. McELWAIN: I think the core issue, the contractual
25 issue, your Honor, to me, is could you sell to commercial

| D9RJENZM | Motions | Page 16 |

1  entities or not. Is research or product development somehow
2  not permitted research under this agreement.
3      If you find that is true, then you have some issues.
4  If you find that is not true, that research or product
5  development is research done at a university or commercial
6  entity, summary judgment is --
7      THE COURT: All right. But Perkinelmer expressly
8  agreed all products sold or distributed would be used only by
9  the research end-user and were neither intended for nor to be
10 used for diagnostic, therapeutic purposes nor to be
11 commercially developed or otherwise commercially exploited.
12     It is pretty broad language. So it seems to me fair
13 to use that language to conclude that I can only sell to people
14 doing pure research.
15     MR. McELWAIN: I don't see how you can square that
16 language with the later language that allows the sale to
17 commercial entities.
18     THE COURT: Look, there are commercial entities that
19 engage in research, and you have doctors and scientists. It
20 seems to me that that would be permitted. If there is somebody
21 who is at Pfizer writing a paper, that they don't use the
22 product for that, they can't send it over to the other part of
23 the lab at Pfizer where they mass produce or are hoping to
24 develop commercially exploitable products. Isn't that a
25 rational distinction that would be consistent with the language

D9RJENZM        Motions                              Page 17

1  of the agreement?
2      MR. McELWAIN: Once you are into the world, you say we
3  can sell to Pfizer, it seems to me it is their burden to come
4  in and show someone at Pfizer used the product improperly.
5  They haven't tried to do that. They're resting their case on
6  the mere fact we sold to Pfizer.
7      THE COURT: That is the reach of your focus.
8      MR. McELWAIN: I have exhausted myself on commerce
9  entities. The other theory appears in the response is the
10 notion that we are per se liable for the acts of our
11 distributors because our distributors are agents. This
12 allegation comes without any citation to any law that suggest
13 that distributors are people's agents or facts that suggest
14 these distributors are our agents.
15     I think there is no basis for an agency theory at all.
16 We sold to distributors. We advised them of the nature of the
17 contract. They did their own labeling. We had no knowledge
18 that our distributors were or were not doing anything improper.
19     I have no knowledge of that today, but if there was
20 some proof that MPI or Amersham or Orchid had violated this
21 agreement, that fact alone cannot impose liability on
22 Perkinelmer.
23     THE COURT: All right.
24     MR. McELWAIN: Leaving the research restrictions, I do
25 want to point out the very unusual nature of this case, which

D9RJENZM        Motions                              Page 18

1  is the Exhibit C products have almost in their entirety been
2  found to be non-infringing. The only products remaining that
3  are still under the cover by the word "patents" or "bio-labeled
4  products" are a few random other products.
5      All of the products we sold to Amersham, all the
6  products we sold to MPI, and all or most of the products we
7  sold to Orchid have been found not infringing, and that would
8  give you the case law in our briefs under those circumstances
9  research restrictions are unenforceable as a matter of New York
10 law and federal law.
11     THE COURT: Restriction of trade theory?
12     MR. McELWAIN: Correct.
13     THE COURT: It doesn't fix prices? It doesn't divide
14 up territories? It is not traditional restraint of trade?
15     You're saying it is not make or break products?
16     MR. McELWAIN: I don't think it is a stretch at all.
17 Enzo is out there selling basically identical products. We are
18 direct competitors with Enzo in the commercial market. To say
19 there is this notion we can't sell in the commercial market?
20     They don't have a right and ability, absent
21 intellectual property, to enter into a contract with us saying
22 we can't compete with them in the commercial market. That is
23 the effect of where we are today with this contract. I think
24 federal law and state law define that unenforceable per se with
25 respect to non-infringing products.

D9RJENZM        Motions                              Page 19

1       I probably should have begun with a fundamental fact,
2  which with I am sure you got from the papers, but I want to
3  emphasize this. These are products we developed, we made, we
4  sold. This is called a distributorship agreement. Enzo
5  doesn't touch these products at any point in the distribution.
6  As a result of your Honor's patent ruling, they do not infringe
7  the Enzo patent.
8       THE COURT: All right.
9       MR. McELWAIN: The payment defense which is sort of
10 still hanging out there I think is largely the same issue we
11 talked about with respect to the breach of contract and
12 research restrictions. I think as a matter of patent
13 infringement, it puts the point on how it can be that a party
14 that makes the proper sale, no infringement, all of a sudden
15 their customer misuses the product, and infringement blows back
16 to the party that sold it.
17      Here we were authorized to make the sale. We made the
18 sale to Pfizer. It cannot be that that sale, not patent
19 infringement the date of the sale, somehow becomes patent
20 infringement a year later when Pfizer misuses the product. The
21 payment defense is highly correlated with breach of contract,
22 but puts the point on you've got to measure Perkinelmer's
23 culpability and liability when they make the sale.
24      THE COURT: There are a couple other contract claims
25 related to discounts.

D9RJENZM        Motions                              Page 20

1       MR. McELWAIN: Correct. On Slide 16, I have crammed
2  all the provisions related to the discount issue on one slide.
3  This is a pure issue of contract interpretation, I think. To
4  us the agreement is clear, this is just a bulk sales kind of
5  provision. The more you buy, the less it costs.
6       THE COURT: Why do you need a range if that is the
7  case? It seems to me you just need thresholds, it wouldn't be
8  ranges.
9       MR. McELWAIN: Thresholds would be, under their
10 theory, you only get the discount if you're above the
11 threshold. For our theory is you make between two and a half
12 and $3 million in sales, there's a 45 percent discount. You
13 make above 5 million, you get a 52 percent discount. It is
14 simply you go to Exhibit H, you look at what range you're in.
15 If you're in that range, that is the discount you get.
16      THE COURT: The issue is whether it is graduated or
17 whether --
18      MR. McELWAIN: The phraseology people use is stepped
19 up applies to all the sales.
20      THE COURT: Right.
21      MR. McELWAIN: You can easily imagine parties entered
22 into a stepped discount provision. I don't see it in this
23 agreement. It would have been an easy-enough thing to write.
24 This agreement says 35 percent, that is the number. If you
25 sell it in different ranges, you get a different number. It is

Case 1:03-cv-03817-RJS   Document 120   Filed 11/04/13   Page 10 of 18

September 27, 2013
ENZO BIOCHEM, INC., et al., v
PERKINELMER, INC., et al.,

| D9RJENZM | Motions | Page 21 |
|---|---|---|

1 simple and straightforward to me.
2          I would also add that there is only one piece of
3 parole evidence on this issue. I don't think it is relevant.
4 The contract is ambiguous. That piece of parole evidence in
5 Exhibit 17 to the Kahn declaration purports to make
6 conversation between Dr. Rabbani and Mr. Levitt of Perkinelmer,
7 where our interpretation of the agreement is confirmed prior to
8 signing it. I don't think we need to go to parole evidence.
9 If you do go to parole evidence, there is one case out there
10 for interpreting the agreement.
11          THE COURT: All right.
12          MR. McELWAIN: I have obviously used my 30 minutes. I
13 have 9 more claims to go. How would you like me to proceed,
14 your Honor?
15          THE COURT: Why don't you to take another six minutes.
16          MR. McELWAIN: The rest of our claims are not in the
17 complaint in any appropriate way. I can pursue that point or I
18 can deal with them on the merits.
19          THE COURT: I guess I need to talk about the kits, the
20 full kit versus the sort of manipulated kits.
21          MR. McELWAIN: This is a hard claim for me to
22 understand because it never has been pled that well. In the
23 complaint they said you split the kits and nucleotides. We
24 asked in our interrogatory, identify the breaches and evidence.
25 We got nothing back on kits.

| D9RJENZM | Motions | Page 22 |
|---|---|---|

1          Then Judge Sprizzo is saying there is no evidence in
2 front of Judge Sprizzo. Now we get what to me is an entirely
3 new theory, which is breach of the obligation of good faith and
4 fair dealing, which is not pled in the complaint in any way,
5 shape or form.
6          Lets assume it is in the case. They cite four e-mail
7 trails. That is our sole sum of evidence. There is no
8 deposition testimony discussing e-mail trails. I worked on
9 this case since 2002. I have a hard time interpreting what
10 these e-mail trails are all about. This is what I think
11 they're about. On Slide 17 I have excerpted out from Exhibit C
12 a bunch of kits that show up in Exhibit C. That is one set of
13 kits that shows up in Exhibit C.
14          Then if you look at Slide 18, I'll see this phrase
15 nucleotides set in micro-max re D and A, a system which is a
16 type of kit introduced around the time the agreement was
17 entered into. This portion of Exhibit C specifically is
18 talking about separating out the nucleotide set and dealing
19 with that separately for the micro-max re system.
20          That is my understanding of what those four e-mail
21 trails were about. I don't think either you or I have to
22 interpret 20-year-old, 15-year-old e-mail chains unaccompanied
23 by any deposition testimony. They simply have no proof of this
24 alleged breach, in my view. I think it is wholly new, the
25 introduction of the notion of good faith and fair dealing,

| D9RJENZM | Motions | Page 23 |
|---|---|---|

1 which was never at issue in the discovery in this case.
2          THE COURT: Let me hear what Mr. Mann has to say and
3 you will get a chance to respond, to touch on things you
4 didn't. Go ahead, Mr. Mann.
5          MR. MANN: We, too, have a demonstrative, but this one
6 really is just a series of excerpts.
7          THE COURT: Excerpts from the record?
8          MR. MANN: Excerpts from the complaint, excerpts from
9 the agreements.
10          I think, your Honor, I should begin with the core
11 question Mr. McElwain spent so much time discussing, and that
12 is this issue of whether or not there is a blanket provision to
13 sell to commercial entities merely by reason of the provision
14 of the contract that carves out --
15          THE COURT: The question should probably be is there a
16 blanket prohibition to anyone other than a research
17 institution?
18          MR. MANN: I think there is with an exemption. I
19 think the contract your Honor pointed out is rather clear that
20 the intention here was to limit sales to research end-users in
21 the research market.
22          THE COURT: Right.
23          MR. MANN: Those words have serious meaning.
24          THE COURT: "Research market" means what?
25          MR. MANN: "Research market" means sales to academia.

| D9RJENZM | Motions | Page 24 |
|---|---|---|

1          THE COURT: What are you referring to, what part of
2 the agreement?
3          MR. MANN: I'm referring to the contract itself, the
4 language that defines research end-user and research market.
5 These are clearly defined to mean the research field, not the
6 commercial development field.
7          THE COURT: "Research market" means the research
8 field?
9          MR. MANN: Right.
10          THE COURT: Don't you find that self-defining?
11          MR. MANN: But it is understood in the business, your
12 Honor.
13          THE COURT: It is not in the agreement, though, right?
14          MR. MANN: Well, it is in the agreement and understood
15 by the parties.
16          THE COURT: There is no definition of research field
17 in the agreement.
18          MR. MANN: To the extent that is a question, that is
19 an issue of fact that can surely be tried.
20          THE COURT: The question is, is there evidence in the
21 record, extrinsic evidence as to what "research field" means?
22 And is it disputed or undisputed as to what it means?
23          MR. MANN: I believe it is not disputed what it means.
24          THE COURT: So is --
25          MR. MANN: I believe it is a construct by PE that

Case 1:03-cv-03817-RJS Document 120 Filed 11/04/13 Page 11 of 18

ENZO BIOCHEM, INC., et al., v
PERKINELMER, INC., et al.,
September 27, 2013

**D9RJENZM Motions Page 25**

suddenly this has become plain in its meaning. Everybody in this business knows what the research market consists of and who research end-users are, and there is a specific prohibition in the contract against commercial developments and therapeutic use and diagnostic use, and those are the uses that the products are put by commercial entities.

Now, there is a carve-out for a contemplation of sales to commercial entities, but as your Honor pointed out, there are ways in which commercial entities can conduct business which have nothing to do with product development.

THE COURT: Unfortunately, the agreement doesn't say, "commercial entities." It says "commercial use," and so I don't think the agreement, by the terms, explicit terms, says that you can't sell to commercial entities. It says you can't use or exploit these products commercially.

MR. MANN: It also contemplates, specifically contemplates in Paragraph I or 1, that there may be a circumstance in which a commercial entity is sold these products.

THE COURT: Right.

MR. MANN: It provides certain prohibitions with respect to them, and it is based on that that Perkinelmer bootstraps itself into the argument it is free to sell to commercial entities and all they have to do is give the notice.

The core question here has two pieces. One is what is

**D9RJENZM Motions Page 26**

the breadth and scope of the restriction? And what is PE's responsibility with respect to it? They say all they have to do is give a notice, perhaps write a letter. If that were true, Paragraph 13 has no meaning whatsoever, in which they undertook best efforts to prevent improper sales under Section 1. That in and of itself --

THE COURT: I says agrees to inform in writing each of the customers who are commercial entities and who order any of the products in the notice given in Subsections G above, and request such customers to acknowledge their written acceptance of the notice prior to shipping the products and to make a copy of the notice.

MR. MANN: That would cover, your Honor. For example, MPI or Amersham. PE got acknowledgments from Orchid and MPI, but never got one from Amersham. That by itself, that is a breach of this provision.

PE had more than a duty simply to write a notice to Amersham to say, "By the way, fellows, you're a self-distributor now and you are limited in what you can do. Here is the limitation."

They had to follow up. They had to at least do what Enzo did, which is to ask the question of Victoria Singer were you making commercial sales or commercial development? On the basis of the mere question, she said yes, surely under the best efforts provision of Paragraph 13, PE had an obligation to ask

**D9RJENZM Motions Page 27**

the question. Had they asked the question, they would have gotten the answer. Had they gotten the answer, they were obliged to tell Enzo. They did neither.

So as to the core issue as characterized by Perkinelmer, there was a restriction known in the trade to limit these sales to commercial -- excuse me -- academic or other research market entities who would only use this product for research, and if and to the extent there was a sale to some commercial entity who could do it that way, use it only for pure research, then it was a burden of PE to make certain that they did it to gain, to send notices, get from them acknowledgments and at least follow up as required by the best efforts provision.

That plays directly into this issue of pricing and payment. There is a clear relationship between the price that was charged in this agreement by Enzo for research-use only and the eschewing of permission to allow commercial sales. Prices were very different for commercial sales. If we ever get to trial in this case, the evidence will show that.

THE COURT: The pricing, whose pricing?

MR. MANN: The price that PE would have sold for commercial purposes, for product development, if permitted, would have been considerably higher than the price for the limited purpose of research-use only.

THE COURT: When you said "would have been," what do

**D9RJENZM Motions Page 28**

you mean, according to the agreement?

MR. MANN: If Enzo would have permitted commercial sales, the price at which PE would have sold the goods would have been much higher than the prices contained in the agreement that were limited and discounted because it was research-use only.

There is a whole different world of pricing that would apply. The advantages in this case for Enzo are not that PE didn't pay them for the sales they made for research-use only, it is that they didn't pay them for commercial sales which would have carried a much higher price.

The testimony will be just that, that the pricing world is very different when you're dealing with research-use only and sales to the University of Pennsylvania as sales are defined.

THE COURT: Here is my question.

Pfizer has scientists who write articles, right, and so they need materials with which to conduct research that will be the subject of their articles just like the University of Pennsylvania does. So are you saying the contract did not contemplate that PE could sell to Pfizer for that limited purpose?

MR. MANN: I'll answer you in two ways:

First, there are ways, clear ways that a commercial entity can use these products for research-use only. For

D9RJENZM        Motions              Page 29

1  example --
2       THE COURT: My question is, under this agreement, was
3  PE allowed to distribute to Pfizer or someone like Pfizer, a
4  commercial entity, for that purpose?
5       MR. MANN: If Pfizer was using this material solely to
6  advance its scientific knowledge, for the purposes of writing
7  an academic paper, I would have to agree with you from an
8  intellectual purpose. If they were using it for development of
9  a product, that is another story altogether.
10      THE COURT: What does the record show with respect to
11 one or the other?
12      MR. MANN: You read out a piece of that record when
13 you referenced Victoria Singer's deposition. She says that
14 that is what commercial entities do. They develop products,
15 that is all they do and there are other --
16      THE COURT: Pfizer is a commercial entity, and that is
17 not all they do, right? You said they sometimes do --
18      MR. MANN: They sometimes do, but at least one witness
19 from one party in this case has said that commercial entities
20 do research for commercial purposes. If and to the extent a
21 sale is made to a commercial entity, it was incumbent upon PE
22 in this case to determine what they were going to use it for.
23      If they were going to use it for a purpose prohibited
24 by the agreement, it was the obligation of PE to tell that to
25 Enzo. They didn't do that. They said all we have to do is

D9RJENZM        Motions              Page 30

1  send the notice. If it was their sole obligation to send the
2  notice, why did anybody write Paragraph 13 of the agreement,
3  which creates a separate duty on the part of PE to use its best
4  efforts to prevent that kind of activity.
5       THE COURT: Part of the transcript I read, which is
6  149 and 150, says were you aware that any were being used for
7  the development of any end product?
8       And you're saying your drug development, you're saying
9  that is not an interpretation for commercial exploitation,
10 correct?
11      MR. MANN: I missed it.
12      THE COURT: The question is were you aware any of the
13 products were being used for commercial use for drug
14 development?
15      The answer of the witness, Ms. Singer was yes.
16      You understood that to be a permitted use? That is
17 research, absolutely.
18      So I think what you are saying is that drug
19 development is by definition commercial exploitation. It is
20 not the kind of research I was talking about with Pfizer.
21      MR. MANN: That is quite correct. Ms. Singer is wrong
22 when she understands research to include research --
23      THE COURT: I don't care what her interpretation is.
24      MR. MANN: What I am --
25      THE COURT: I am asking what is meant by the use of

D9RJENZM        Motions              Page 31

1  the word "drug development" in the question, 150 line 7 through
2  8, and as to you, this drug development in your mind is
3  synonomous with commercial exploitation.
4       MR. MANN: Yes, and in our view the time period that
5  lapses between the undertaking of that research for commercial
6  development and the development of the product which can be
7  years is not relevant to the question. The mere fact that they
8  embarked on commercial development research in, let us say
9  2013, but consistent get a commercially developed product
10 approved by the FDA until 20/20 is not meaningful in the
11 understanding of this agreement.
12      Here, as in other instances of this motion, your
13 Honor, clearly there are two interpretations of this contract.
14 There is PE's interpretation which limits their responsibility
15 simply to writing letters and getting acknowledgements, and
16 there is Enzo's interpretation of this agreement which is quite
17 different as I have been discussing.
18      That by itself earns us I think the right to a trial
19 on this issue.
20      THE COURT: There are a couple of other points Mr.
21 McElwain made. There may be other points you want to answer
22 first.
23      MR. MANN: Sure. Absolutely. He argues that PE was
24 not a guarantor for the principal of an agent in MPI or Orchid
25 or Amersham. If you look at the letters which PE wrote to

D9RJENZM        Motions              Page 32

1  these entities informing them they were now self-distributors
2  under an agreement between Enzo and PE and asked for
3  acknowledgments of that so they would understand they are
4  bound, and PE has an undertaking to make certain that they
5  follow those prescriptions, then PE is liable if the entities
6  that they are supposed to be supervising and watching don't
7  perform in the way they're supposed to perform.
8       THE COURT: You say this is strict liability?
9       MR. MANN: Not strict liability. Had they undertaken
10 to do their job and were nonetheless deceived, that would be an
11 excuse, but they didn't undertake to do their job. All they
12 did was write a letter.
13      THE COURT: What was their job beyond that?
14      MR. MANN: Their job was to write the letter, get an
15 acknowledgement and supervise to the extent that Paragraph 13
16 requires them to inquire. They undertook in Paragraph 13 to
17 exert its best efforts to comply with the provisions of Section
18 1 and to prevent, prevent commercial development and
19 exploitation of the products. That is much more than just
20 writing a letter and getting acknowledgement.
21      If they were so, what was the purpose of putting in
22 Paragraph 13? It has to have some meaning, and that some
23 meaning exceeds what Mr. McElwain says gives the sole
24 responsibility to PE in these circumstances. Certainly there
25 is a difference of opinion. It is a fundamental difference of

D9RJENZM         Motions                    Page 33

1  opinion, I grant you, but it is a difference of opinion that I
2  think warrants a trial on that issue.
3       THE COURT: "Agrees to exert its best effort to
4  prevent commercial development or exploitation of the products
5  sold or shipped to others." Your view means that what, they
6  have to go undercover?
7       MR. MANN: No, I don't want to be silly about it.
8       THE COURT: I mean what are they supposed to do? You
9  write a letter saying you can only use it for the following
10 purposes. They get acknowledgements and then what are they
11 supposed to do?
12      MR. MANN: They knew MPI was using it and selling it
13 for commercial purposes.
14      THE COURT: What is in the evidence in the record for
15 that? Just a piece of --
16      MR. MANN: No. The evidence in the record is the
17 correspondence and the testimony and the recognition that when
18 Orchid and MPI were using these encyclics and attaching the
19 nucleotides to them, that they were going to use it for
20 commercial purposes. It is all Orchid does. That is all MPI
21 does.
22      THE COURT: In the end, it is not. We already talked
23 about the hypothetical which Pfizer sometimes does research. I
24 don't know that these other operations sometimes do research?
25      MR. MANN: They do not. MPI uses it for commercial

D9RJENZM         Motions                    Page 34

1  purposes. They sold products.
2       THE COURT: Is the record clear that the defendants
3  understood that and knew they were using it for commercial
4  development?
5       MR. MANN: There is a -- I am sorry, I don't have the
6  reference to it, to the Elliott declaration -- there is an
7  interplay between Enzo and Orchid, and in it the Orchid person
8  says, "Can I use this for commercial development?" "No" is the
9  answer. "Can I use this for product development?" "yes."
10      THE COURT: All right. And so what you're saying is
11 if the issue that the fact-finder gets to decide is whether the
12 contract allows product development, the way product
13 development is by definition, commercial development?
14      MR. MANN: It is, by the way, your Honor, Exhibit 9.
15      MR. LEFTON: 72.
16      MR. MANN: The summary of Ms. Singer.
17      THE COURT: Exhibit 9?
18      MR. LEFTON: 74.
19      THE COURT: 74.
20      MR. MANN: I am sorry. The exhibit tag was 9. It is
21 Exhibit 74.
22      THE COURT: What is the exhibit to the --
23      MR. MANN: No. 74 to the Elliott deposition. May I
24 hand it up, your Honor?
25      THE COURT: You may hand it up.

D9RJENZM         Motions                    Page 35

1       (Pause)
2       THE COURT: You're talking about Question 3?
3       Even though I had commercial interest such as Pharma,
4  can I use this product for internal research and development
5  such as drug discovery? Answer, yes.
6       That is what you're referring to?
7       MR. MANN: Yes, drug discovery means drug --
8       THE COURT: I don't know that. How would I know that?
9  Is there something in the record that defines that it
10 is such?
11      MR. MANN: No.
12      THE COURT: Is there something in the record that
13 indicates that is the term of art?
14      MR. MANN: I believe that is just a common sense
15 interpretation of identification. If you identify a drug, that
16 is the first step in development.
17      THE COURT: I don't know who wrote this and I don't
18 know who chose these words, summary of the talk with Singer.
19 That is somebody paraphrasing the conversation they had with
20 her?
21      MR. MANN: Yes.
22      THE COURT: Somebody chose to use the word, "drug
23 discovery." I don't know what the state of the record is who
24 chose that word and why.
25      MR. MANN: The reason I showed it to you was in

D9RJENZM         Motions                    Page 36

1  response to a question whether or not PE had any knowledge or
2  could have had any knowledge about the use that these products
3  were being put. All they had to do was ask a question.
4       THE COURT: What does, "discovery" mean?
5       MR. MANN: What were you using it for?
6       THE COURT: Using it for drug discovery?
7       MR. MANN: What does that mean?
8       All of this comes back, your Honor -- and I don't
9  think we should belabor this any further -- it all comes down
10 to what is the obligation of PE in the context of the best
11 efforts clause of this agreement?
12      Is it as they say, a requirement only to inform their
13 customers of the research restrictions and get an
14 acknowledgement thereof or is something different?
15      The provision of the contract provides for the giving
16 of that notice and giving the acknowledgement and adds the best
17 efforts undertaking to have some meaning.
18      THE COURT: While we are changing gears, can I ask you
19 a question?
20      MR. MANN: Of course.
21      THE COURT: There are a couple of claims you walked
22 away from. One is the Lanham Act and the other is unfair
23 competition, right?
24      MR. MANN: Yes.
25      THE COURT: What of tortious interference? Are you

| D9RJENZM | Motions | Page 37 |
|---|---|---|

1  still sticking with that?
2       MR. MANN: Yes, and fraudulent inducement.
3       THE COURT: Let's talk about tortious interference.
4  What is there in the record to indicate that
5  Perkinelmer interferes with your relationship with -- I think
6  the only thing I have seen in the papers is a footnote. I see
7  one statement that goes to this. I am at a loss.
8       MR. MANN: There --
9       THE COURT: Tell me what there is. That makes it easy
10 to answer the question.
11      MR. MANN: PE says Li-Cor's testimony in the
12 deposition was that PE had nothing to do with our determination
13 to terminate the contract with with Enzo.
14      THE COURT: Right.
15      MR. MANN: You'll recall that the potential
16 interference has to do with PE giving away of the legal
17 contract for the purpose of being able to sell.
18      THE COURT: Right.
19      MR. MANN: In the raft of letters that Li-Cor and Enzo
20 exchanged in the process of terminating their relationship,
21 there is a single reference to the fact prior to the
22 termination, that Enzo is selling product to them which is too
23 expensive and that PE has a cheaper product that works just as
24 well.
25      That is the only reference in the documentary record

| D9RJENZM | Motions | Page 38 |
|---|---|---|

1  that I have been able to find that deals with that issue, but
2  as to the question of what Li-Cor said in the deposition, what
3  else were they going to say? They're certainly not going to
4  say that we canceled the agreement so that we could get into a
5  relationship with PE in order to injure Enzo. They're not
6  going to say that.
7       THE COURT: You have you have to point in evidence.
8  You can't say we had a contractual relationship with a third
9  party. We no longer do. They now have a relationship with the
10 defendant. Therefore, the defendant must have interfered. You
11 have to have something else.
12      MR. MANN: There is a bit more on that subject. Enzo
13 was related at the time Li-Cor was trying to terminate the
14 contract, that Li-Cor was already in breach of the contract,
15 they couldn't terminate it on that basis. They didn't have
16 about cause termination. There is a bunch of correspondence
17 about that in the record.
18      The result of that in the back-and-forth was Enzo
19 saying to lee company already, if you give me the reports that
20 you are supposed to give me and cures those breaches and you
21 pay what it is you are supposed to pay, we'll forget about the
22 fact you're in breach.
23      PE makes the argument in summary judgment that we
24 didn't sue Li-Cor. We didn't sue Li-Cor because it was
25 commercially not in Enzo's best interest.

| D9RJENZM | Motions | Page 39 |
|---|---|---|

1       THE COURT: They're not required to sue.
2       MR. MANN: Correct. That is not a good argument on
3  their part.
4       THE COURT: That doesn't put any more meat on the
5  bones, what we are talking about.
6       MR. MANN: All that there is on the Li-Cor issue is a
7  body of circumstantial evidence buttressed by slight pieces of
8  documentary evidence that remarkably Li-Cor terminates
9  immediately and goes into arrangement with Perkinelmer for
10 products which Enzo made payments, Perkinelmer had no right to
11 make and sell under the distribution because they were not
12 added as Exhibit C products.
13      THE COURT: All right. Any other points you want to
14 cover?
15      MR. MANN: Yes, your Honor.
16      With respect to the fraudulent inducement, the
17 economic loss argument, that is that the alleged fraud arises
18 from the same contract issues that we are suing on, and that
19 what Enzo is urging is that PE didn't intend to fulfill its
20 obligations under the distribution agreement. It is just not
21 true.
22      What Enzo is arguing here is that when PE entered into
23 the settlement agreement -- and this is pleaded in the
24 complaint, your Honor -- when PE entered into the settlement
25 agreement, it entered into it knowing that the representations

| D9RJENZM | Motions | Page 40 |
|---|---|---|

1  it was making with respect to the strength of Enzo's patents,
2  the prior infringement of Enzo's patents, the domination of
3  Enzo's patents over the Dupont patents was not true.
4       The PE president who signed that agreement in his
5  deposition said he didn't believe it was true. On the basis of
6  his having said that, and those representations having been
7  made, it is quite apparent what happened here was that in order
8  for PE to be able to get access to the Enzo IP, and to be able
9  to go forward and make these sales, it caused Enzo to enter
10 into the distribution agreement.
11      While it may have intended to perform that
12 distribution agreement appropriately at the time it entered
13 into it, they didn't. They got us to enter into the
14 distribution agreement by making a series of false
15 representations in a second collateral agreement which has
16 nothing to do -- which isn't a distribution agreement.
17      THE COURT: Which is the second collateral agreement?
18      MR. MANN: The settlement agreement.
19      THE COURT: The settlement, right.
20      MR. MANN: The fraudulent inducement occurs in getting
21 those on the basis of the representations made in the
22 settlement agreement. To enter into the distribution agreement
23 which they promptly violated, that is the substance of the
24 fraudulent inducement, not as PE describes, it but as Enzo
25 describes it.

Case 1:03-cv-03817-RJS   Document 120   Filed 11/04/13   Page 15 of 18

ENZO BIOCHEM, INC., et al., v
PERKINELMER, INC., et al.,
September 27, 2013

**D9RJENZM         Motions         Page 41**

1    With respect to the restraint of trade, I am a little
2 chagrined by the briefing by both parties here. We didn't do a
3 very good job of it, I am afraid. The Supreme Court of the
4 United States, in a case much later than anything cited by PE,
5 has determined that in a vertical relationship such as we have
6 here, buyer and seller, in the absence of monopoly power
7 restrictions such as the ones we are talking about in this
8 agreement that are non-pricing restrictions, but have to do
9 with end use, and end users are perfectly permissible, and this
10 is not a case of restraint of trade, not a case of patent
11 misuse.
12    If your Honor bears with me just a second?
13    In Illinois Tool Works against Independent, Inc, 547
14 U.S. 28, a 2006 case, and Continental TV, Inc. versus GTE
15 Sylvania, 433 U.S. 36, a 1977 case, you will find that the
16 court has held that the existence of a patent which is either
17 invalid or non-infringed has nothing to do with the question
18 whether or not the restrictions imposed in a commercial
19 arrangement are valid and enforceable.
20    I think, your Honor, that those cases will change the
21 landscape with respect to these arguments about restraint of
22 trade. I don't think either of us did a very good job for you
23 in briefing them.
24    THE COURT: All right. I wasn't too sold on restraint
25 of trade. That wasn't clear. In any event, I think that is

**D9RJENZM         Motions         Page 42**

1 your time, Mr. Mann. Is there anything else you want to say in
2 30 seconds?
3    MR. MANN: Are there any other questions?
4    THE COURT: No, I don't think I do.
5    MR. MANN: Thank you.
6    THE COURT: Thank you, Mr. McElwain.
7    MR. McELWAIN: I will go in reverse order.
8    On the fraud in the inducement claim, I commend you to
9 compare Paragraph 96 of the complaint, which is how they
10 characterized misrepresentation they're relying on today. The
11 two are really quite different and it has to be fundamental to
12 a fraud claim they have to identify misrepresentation. As to
13 the misrepresentation they identified today, it is that we said
14 something about, we had an admission of infringement they were
15 liable. I believe that is the essence of it.
16    Those admissions and stipulations were referenced in
17 the distributorship agreement which expressly provides they
18 become null and void when the agreement expires. There are two
19 things going on there:
20    One, they can't rely on them as any basis of the claim
21 because they become null and void;
22    Two, because they become null and void, that indicates
23 as clearly as you possibly can that no one was relying on the
24 stipulations of infringement. They were meant to give Enzo a
25 litigation advantage, should there ever be litigation under the

**D9RJENZM         Motions         Page 43**

1 agreements. I don't think the new claim is in the case at all.
2 It is manifestly flawed.
3    I don't want to belabor that because you probably got
4 it. Not only did they not sue for breach of contract, they
5 don't demonstrate breach of contract. We are in a tortious
6 interference world if we are anywhere and there is no
7 demonstration of wrongful means. They don't demonstrate
8 causation. That is the point of the deposition testimony.
9    Lastly, if I could just take one final run at the
10 commercial research point? I was thinking, imagine the
11 research tool is a microscope. Obviously, microscopes are used
12 for drug-dealing and microscopes are used in institutions. If
13 you sell that microscope to Pfizer, even if it is used in drug
14 discovery, no one would say that is commercial exploitation of
15 a microscope, or I sure wouldn't say that.
16    THE COURT: I can't imagine restriction on commercial
17 exploitation on a microscope. I am not sure that is --
18    MR. McELWAIN: The analogy would be say you take that
19 microscope and you resell it. That is commercial exploitation.
20 Say you take that microscope and slap it on a tube and turn it
21 into a telescope? That might be commercial.
22    In the case of nucleotides, there is one commercial
23 use which the agreement clearly references which is a
24 diagnostic. If you take a nucleotide and put it on a piece of
25 DNA, it will allow you to detect DNA. That is a commercial

**D9RJENZM         Motions         Page 44**

1 use. That is clearly excluded by the agreement.
2    THE COURT: No question it is completely excluded.
3 The issue is what else is excluded?
4    MR. McELWAIN: I won't repeat myself. The jig is up
5 once there is an agreement we can sell to commercial entities
6 because there is no proof any of those commercial entities
7 misused the product.
8    THE COURT: The part of the transcript that I have now
9 read a couple of times talks about drug discovery, new drug
10 discovery.
11    MR. McELWAIN: I think this is an issue of contract
12 interpretation, and maybe the court will find it is ambiguous.
13    THE COURT: I understand it is --
14    MR. McELWAIN: I understand.
15    THE COURT: You are going to trial, right?
16    MR. McELWAIN: I understand. My point is I do think
17 there is a contractual interpretation point to be made here,
18 and that research, whether it is for commercial or other
19 purposes, is permitted. There is no limit on the type of
20 research you can do. It says you can do research. You can do
21 it for fancy, for academics or commercial. There is no limit
22 on the type of research.
23    THE COURT: It doesn't say that, right? You're saying
24 you think that is consistent with what the words are. They
25 don't say you can do it for any --

| D9RJENZM   Motions                                Page 45 | D9RJENZM   Motions                                Page 47 |

**Page 45**

1  MR. McELWAIN: I guess I can't imagine why anyone
2  would say that Pfizer scientists sitting at the bench and
3  trying to discovery new drugs is not engaged in research. That
4  would be a shock to Pfizer scientists, I feel confident.
5      What the contract is meant to do is to exclude the
6  product being used, and a reselling of the product, taking the
7  product and making it into different product, that is what
8  commercial exploitation and commercial development is.
9      THE COURT: I wish I knew, but I am not sure it is so
10 obvious. All right. Okay. Anything else?
11     Any other points?
12     MR. McELWAIN: No.
13     THE COURT: I am going to do research.
14     I think, candidly, this will be a split decision, and
15 a split decision means we are going to be going to trial. I
16 will give you as much notice of that as possible. I am making
17 the trial November 4th. This is a slot-out date for trial.
18 That is the first one I have slotted. I think this would be
19 the one that will fill that slot.
20     MR. MANN: May I be heard?
21     THE COURT: Sure.
22     MR. MANN: You will recall, you recall --
23     THE COURT: Don't assume I recall anything. That is
24 why there is a transcript.
25     MR. MANN: There has not been damages discovery in

**Page 47**

1  MR. MANN: We will have an expert who has been on all
2  sides of this industry, who will testify what those words mean
3  in the industry.
4      THE COURT: That shouldn't take too much time.
5      MR. MANN: No. We will have an expert on damages who
6  will talk about the pricing model, who will talk about the
7  calculations. Those people have to be identified, they have to
8  write their reports, there may be Daubert hearings. There
9  needs to be rebuttal.
10     I think, your Honor, I am the plaintiff, so we want to
11 go to trial, but in fairness and reasonably, I don't think we
12 can accomplish this and all of the other things preliminary to
13 trial by November 4th. It us just a month away, your Honor.
14     THE COURT: All right. I can set several trial dates
15 because --
16     MR. MANN: You did ask us to research another two-week
17 period, January 15th. That certainly would be more rational
18 from our perspective.
19     THE COURT: Do you want to see --
20     MR. MANN: You mentioned this last January, and we
21 appreciate that. We have all been in the situation of losing
22 valued -- I think he is entitled to at least a gold watch.
23     THE COURT: I hear what you're saying. I will perhaps
24 have to revisit the timing. I will give you more guidance with
25 a written decision.

| D9RJENZM   Motions                                Page 46 | D9RJENZM   Motions                                Page 48 |

**Page 46**

1  this case. There has not been expert discovery in this case or
2  in any of the cases for that matter. Damages discovery in
3  these cases -- this one, too, has been -- is very interesting
4  because during the 10 years of prior discovery here, whenever
5  questions were asked that could arguably by defendants be said
6  to be damages-related, discovery was not provided.
7      All that has ever been provided from PE that I am
8  aware of is a list, schedule of list which had been somewhat
9  updated who they sold it to and how much they sold. There is a
10 lot of damages discovery that is yet to be done in this case.
11 Frankly, your Honor, I don't see it getting done with expert
12 discovery and pretrial orders and jury instructions and all of
13 the rest by November 4th. I think that is an enormous
14 undertaking.
15     THE COURT: Do you agree?
16     MR. McELWAIN: Your Honor, obviously I don't know what
17 a split decision is. If we are going to try the split
18 decision, we are ready to go on November 4th. If it is
19 something else, I don't know. Mr. Mann is correct, there has
20 been no damages discovery.
21     THE COURT: What does the expert discovery mean in
22 this case?
23     MR. MANN: We will have an expert on the question of
24 research-use only and pricing.
25     THE COURT: What expert?

**Page 48**

1  MR. McELWAIN: On damages, it was our understanding,
2  and I am perfectly happy to revisit this, Judge Sprizzo
3  bifurcated damages. If the suggestion is we are un-bifurcating
4  damages, that needs to be understood. Damages was never in the
5  case after Judge Sprizzo.
6      THE COURT: You think we can have a trial and another
7  trial on damages?
8      MR. McELWAIN: My view, subject without having spoken
9  to the client, is that bifurcation doesn't really make sense
10 any more and I think if there was clarity in damages, there
11 might be other benefits of that. It is a fact that damages is
12 just not --
13     THE COURT: Why don't you guys do this: You think and
14 chat amongst yourselves. I will issue a ruling that gives
15 greater guidance, and then probably at the end of that ruling
16 I'll ask you to submit a joint letter with your proposals as to
17 next steps, and then maybe you'll agree or disagree. We'll
18 have some combination of those two things.
19     MR. MANN: Great idea.
20     THE COURT: With that then, why don't we adjourn. I
21 thank the Court Reporter for his time, and I need a copy of the
22 transcript.
23     (Court adjourned)
24
25

FOR DISCUSSION PURPOSES ONLY

**Proposed Schedule for Expert and Damages Discovery and Pretrial**

a. Enzo shall serve a description of its theory of damages by [___]. The description need not include numbers but will be in sufficient detail to allow PerkinElmer to determine what discovery, if any, it needs to respond to Enzo's damages case.

b. PerkinElmer shall serve its rebuttal statement to Enzo's description by XXX in the same level of detail.

c. The parties will meet and confer by XXX to discuss the content of additional discovery, if any, related to damages.

d. Any disputes about the additional discovery shall be presented to the Court by XXX.

e. Any additional documents or interrogatory responses will be provided by the parties by XXX.

f. Party depositions related to damages shall be completed by [___].

g. Third-party discovery relating to damages shall be completed by [___].

h. All expert disclosures on all issues, including reports, production of underlying documents, and depositions shall be completed pursuant to the following deadlines:

   i. Each party shall identify the expert(s) they anticipate proffering at trial, along with a general description of the expert(s)' testimony, no later than [___].

   ii. Opening expert reports on issue(s) for which a party bears the burden of proof shall be served no later than [___].

   iii. Rebuttal expert reports shall be served no later than [___].

   iv. Expert depositions shall be completed no later than [___].

   v. Any motions to exclude expert testimony shall be filed no later than [___] days after that expert's deposition. Oppositions shall be due [___] days after filing of the motion to exclude, and replies due [___] days after filing of the opposition. If any of these days falls on a holiday or weekend, the papers shall be filed the next business day.

i. All expert and other damages-related discovery shall be completed no later than [___].

j. The joint pre-trial order shall be completed and submitted pursuant to the following deadlines:

FOR DISCUSSION PURPOSES ONLY

    i. The parties shall exchange proposed pre-trial orders and the items specified in Judge Sullivan's Individual Practices, Section 3(B) (exhibit lists, jury instructions, deposition designations, etc.) by [___]. Initial objections, responses, counter-designations, etc. shall be served by [___], and the parties are to confer thereafter.

    ii. The parties shall submit a joint pre-trial order on [___].

k. Any motions in limine shall be served and filed by [___], with oppositions due on [___], and replies due on [___].

l. The Court will conduct a pre-trial conference on [___].

m. Counsel must meet for at least one hour to discuss settlement not later than [___].

n. The parties have conferred and their present best estimate of the length of trial is __ days.