UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2-26-14
```

ENZO BIOCHEM, INC., *et al*

                    Plaintiffs,

-v-

PERKINELMER, INC., *et al.*,

                    Defendants.

No. 03 Civ. 3817 (RJS

ORDER

RICHARD J. SULLIVAN, District Judge:

The Court is in receipt of the attached joint letter ("Joint Letter"), dated February 21, 2014, submitted by Enzo Biochem, Inc. and Enzo Life Sciences, Inc. (collectively, "Enzo") and PerkinElmer, Inc. and PerkinElmer Life Sciences, Inc. (collectively, "PerkinElmer") concerning discovery disputes. In short, Enzo seeks (1) to compel PerkinElmer to produce certain discovery; and/or (2) sanctions. The Court will address Enzo's requests in turn.

I. BACKGROUND

Enzo filed its first complaint against a group of defendants, including PerkinElmer, on October 23, 2002, and refiled its Complaint against PerkinElmer in this action on May 28, 2003. (Doc. No. 1.) Discovery in this action was bifurcated between liability and damages. On November 11, 2013, the Court endorsed the parties' joint proposed schedule for "Damages and Expert Discovery and Pretrial Submissions," which set a deadline of January 27, 2014 for the completion of "[p]arty depositions and any third-party discovery relating to damages." (Doc. No. 121.) This scheduling order sets, *inter alia*, a deadline of February 21, 2014 for the completion of expert depositions and a trial date of March 18, 2014. (*Id.*)

During damages discovery, Enzo sought certain information from PerkinElmer to provide a basis for Enzo's damages expert's opinions. Some data relevant to this information is apparently unavailable as a result of a change that PerkinElmer made to its data storage system during the pendency of this litigation. On January 14, 2014, PerkinElmer informed Enzo of the system change and the resulting unavailability of some of Enzo's requested information. The information requested by Enzo, which is no longer accessible due to this system change, includes (1) sales and order information and (2) cost information. Specifically, Enzo maintains that the system change precluded production of "documents critical to Enzo's damages expert's opinions . . . [including] documents evidenc[ing] PerkinElmer's sale of ersatz kits . . . [which] would allow Enzo's expert to opine regarding disgorgement of PerkinElmer's profits, and potentially allow for a complete lost profit analysis." (Joint Letter at 2.) From what the Court can glean from the parties' at times confusing submission, the parties dispute whether PerkinElmer has produced other documents which would render the unavailable sales and order information duplicative, thereby making their unavailability irrelevant. With reference to the missing cost information, PerkinElmer disputes the relevance of this information, but nonetheless offered to meet and confer regarding this material and proposed stipulating to facts relevant to cost. The parties also appear to dispute both whether certain discovery requests were timely and whether PerkinElmer's actual productions are consistent with deposition testimony concerning what PerkinElmer has available to produce, such as certain types of invoices identifying custom product sales and quotations for custom products.

As described in the Joint Letter now before the Court, Enzo seeks to file a motion to compel certain discovery, and/or sanctions.

2

## II. ENZO'S MOTION TO COMPEL

Rule 26(b) of the Federal Rules of Civil Procedure allows parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense[.]" *See* Fed. R. Civ. P. 26. Rule 34 of the Federal Rules of Civil Procedure governs how a party may serve on another party a request within the scope of Rule 26(b). *See* Fed. R. Civ. P. 34. For example, Rule 34 provides that a party may make a request "to produce and permit the requesting party to inspect, copy, test, or sample [a wide variety of documents or electronically stored information] in the responding party's possession, custody, or control[.]" *Id.* However, Rule 34 cannot be used to force a party to produce a document that it does not have. *See Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 138 (2d Cir. 2007) ("[A] party is not obliged to produce, at the risk of sanctions, documents that it does not possess or cannot obtain."); *see also* 7 Moore's Federal Practice § 34.14 ("A document that does not exist is obviously not within the possession custody or control of a party. Rule 34 may not be used to require a party to prepare a writing to be produced for inspection[.]")

It is unclear from the parties' submission whether certain types of documents containing the information sought by Enzo even exist. To the extent that such documents do not exist, PerkinElmer cannot be forced to produce them. *See* Fed. R. Civ. P. 34. To the extent that documents containing such information do exist, the Court finds that Enzo's request to compel production is untimely because Enzo did not bring this discovery dispute to the Court's attention until weeks after the January 27, 2014 deadline for the completion of "discovery relating to damages." (*See* Doc. No. 121) Accordingly, IT IS HEREBY ORDERED THAT PerkinElmer shall not be compelled to produce the discovery sought in the parties' joint letter.

III. SANCTIONS

Enzo also seeks various sanctions against PerkinElmer, including striking PerkinElmer's answer, precluding presentation of contrary evidence, an adverse inference instruction, and/or disgorgement of profits. In essence, Enzo argues that PerkinElmer's change to a data storage system, and the resulting unavailability of some data, amounts to sanctionable spoliation of evidence. Rule 37(b) of the Federal Rules of Civil Procedure, which governs failures to comply with discovery orders, provides, in relevant part, that if a party "fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders," including, for example, an order that "designated facts be taken as established for purposes of the action" or "strik[es] pleadings in whole or in part[.]" *See* Fed. R. Civ. P. 37(b)(2)(A).

At the outset, the Court questions whether PerkinElmer's actions with respect to the data system amount to a discovery violation which might warrant sanctions under Rule 37. It remains unclear to the Court exactly what information Enzo seeks that it was entitled to during discovery and has yet to receive due to the alleged spoliation of evidence. It is equally unclear as to whether the unavailable data sought by Enzo might, in reality, be accessible through a different vendor or the development of specialized software. Regardless, to the extent that Enzo is seeking sanctions because of the non-production of the discovery it sought to compel, *see supra* Sec. II, the motion for sanctions is also untimely. Enzo was informed about the potential unavailability of evidence on January 14, 2014 – or at the latest January 25, 2014– and Enzo waited nearly a month to bring this issue to the Court's attention, even though the Court had set a trial date of March 18, 2014. Accordingly, Enzo has failed to make a case for sanctions and its motion is denied.

## IV. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED that Enzo's motions to compel and for sanctions are deemed made and DENIED.

SO ORDERED.

DATED: February 26, 2014
New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

Jeffrey R. Mann
Tel (212) 801-2111
Fax (212) 224-6125
mannj@gtlaw.com

February 21, 2014

**BY E-MAIL** (sullivannysdchambers@nysd.uscourts.gov)

Honorable Richard J. Sullivan
United States District Court, S.D.N.Y.
500 Pearl St., Room 615
New York, NY 10007

Re: *Enzo Biochem, Inc. et al. v. PerkinElmer, Inc. et al.*, No. 03 Civ. 3817 (RJS)

Dear Judge Sullivan:

Pursuant to the Court's Individual Practices § 2.G, Plaintiff Enzo and Defendant PerkinElmer jointly submit this letter to request a conference concerning Enzo's proposed motion to compel certain discovery and/or seek spoliation sanctions.

**I. Enzo's Position — Background**: In 2012,[1] after ten years of litigation and prior to damages discovery, PerkinElmer ("PE") effectively destroyed its enterprise resource planning system ("ERP") that contained financial, manufacturing, and distribution information relevant to this case. Among the destroyed documents were invoices, or the data from which invoices were prepared, dating from 1999 through May, 2003, showing that PE's kit components were sold with Enzo Products, and manufacturing cost information and inventory records prior to 2002.

Separately, PE cannot identify a significant number of the Enzo Products it sold. Over 25% of the revenue PE received from selling Enzo Products derived from its sale of "custom" products. Despite testifying that every "custom" sale was reflected in a "custom quotation" made to the customer, PE only produced 600 custom quotations for over 3,100 custom sales. Many of these "custom" sales were merely bulk quantities of listed products for which PE did not make payment to Enzo based upon the agreed price, but instead paid based on the discounted custom sale price. Other products were sold separately, but should have been sold as part of an Enzo kit. Absent identification of the product sold in each custom sale, Enzo's damages expert cannot fully determine Enzo's lost profits.

PE's unwarranted failure to maintain data during the stay of damages discovery, including the 2012 disabling of its ERP data, and its "loss" of "custom quotations," warrant the severest of sanctions pursuant to F.R.C.P. 37(b)(2)(A) and the Court's "inherent power to manage its own affairs," including striking PE's answer, or, alternatively, precluding presentation of contrary evidence by PE, or otherwise fashioning an appropriate remedy as a sanction for the spoliation such as disgorgement of revenues less manufacturing costs. *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).

**Destruction of the ERP System**: Liability and damages discovery were bifurcated in this action and PE objected to the production of its invoices, purchase orders, cost information, inventory and sales records for more than ten years, through summary judgment. When damages discovery finally began in November 2013, Enzo again demanded this information as a basis for its damages expert's opinions. *See* Ex. 2 (Enzo's Nov. 25, 2013 Damages Requests) at Requests

---

[1] *See* Ex. 1, Stump 30(b)(6) Deposition at 40:14-20; 228:3-232:22; 255:3-23. PE now maintains the data became unavailable in 2007, still five years after this litigation began. *See infra*.

2 & 6. PE, though, produced only a handful of these documents. After several meet and confers in 2013 and January 2014, PE informed Enzo that it found 30 boxes of invoices, but nearly all the invoices pertained to products irrelevant to this case. Despite only producing a very small number of the requested documents, PE represented that it "produced for inspection by Enzo the documents that it located in its files." *See* Ex. 3.

The reason PE did not produce invoices or documents identifying PE's pre-2002 costs or identifying custom products (such as inventory relief records) was finally revealed in the January 24th and 25th depositions of PE's 30(b)(6) witnesses. According to Howard Stump, PE's ERP system, which archived PE's financial, manufacturing, and distribution information, was taken offline in 2012, just prior to damages discovery, and PE cannot restore it. *See* Ex. 1, Stump Dep., at 40:14-20; 228:3-232:22; 255:3-23. PE's willful breach of its basic discovery obligation – to preserve evidence and not destroy it in the midst of an ongoing lawsuit – has precluded the production of documents critical to Enzo's damages expert's opinions. The documents would evidence PE's sale of ersatz kits (*see* Ex. 4) (the single invoice found contradicts Mayer's testimony and shows that the PE kit was sold with Enzo's Products),[2] would allow Enzo's expert to opine regarding disgorgement of PE's profits, and potentially allow for a complete lost profits analysis. PE's Answer should be stricken as a result of its improper conduct. *See Cristie's v. Bretal*, 96 Civ. 0170, 1996 WL 660906, at *1 (S.D.N.Y. Nov. 14, 1996) (striking answer "due to defendant's failure to cooperate with discovery").

An adverse inference based on PE's spoliation could partially mitigate the harm. An adverse inference is proper where (1) the party had an obligation to preserve the evidence; (2) the records were destroyed with a culpable state of mind, *i.e.*, "knowingly, even if without intent to breach a duty to preserve it, or negligently;" and (3) that the destroyed evidence is relevant, in that a reasonable trier of fact could find that it would support a claim or defense. *Residential Funding Corp.*, 306 F.3d at 107-08. The first factor is met, because PE knew, or should have known, that Enzo would demand information from PE's ERP. Second, PE plainly was aware that by "taking down" its ERP system, the data could be lost. Its grossly negligent actions constitute culpability. *See Augstein v. Leslie*, 2012 WL 4928914, at *6 (S.D.N.Y. Oct. 17, 2012) (adverse inference proper for negligent destruction of documents); *Byrnie v. Town of Cromwell*, 243 F.3d 93, 109 (2d Cir. 2001). Finally, the invoices are relevant because they are tangible evidence that PE improperly sold its products with Enzo Products to create a functional kit. A complete set of ersatz kit invoices is simply the best, clearest evidence of PE's misconduct. Manufacturing costs are a critical input for Enzo's damages expert's disgorgement opinion, and PE's costs for the first three years of the Agreement have been destroyed. And inventory records could have identified each custom product sold, allowing Enzo's damages expert to conduct a complete lost profits analysis. Enzo is prejudiced by the destruction of this data. *See Residential Funding Corp.*, 306 F.3d at 108 ("risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss"); *Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 505 (S.D.N.Y. 2013) (Scheindlin, J.) (same).

**Missing Identification of Custom Products**: PE also has not produced documents to identify its "custom" product sales. PE identified 25% of its sales as "Custom Nonrad Nucleotide Analogs."

---

[2] PerkinElmer has refused to produce the invoices that are apparently available, dating from May, 2003. *See* Ex. 3 at 1 (asserting, contrary to the testimony of PerkinElmer's witness, that the documents "do not presently exist." As Mr. Stump testified, the information exists on a database.) Enzo respectfully requests that the Court order the immediate production of PE's invoices, or the data underlying printed invoices.

The "only" way to identify the product sold in each custom sale, according to PE 30(b)(6) witness Pat Mayer, is to compare the "custom quotations" PE gave to its customers[3] (which identified the actual product sold), to PE's sales spreadsheet, and use surrounding information on the offers (date, customer, and price) to identify what each custom purchaser bought.[4] Ms. Mayer confirmed that there was "a custom quote sheet prepared for every sale of a custom product." *See* Ex. 5 at 108:24-109:6.

PE had over 3,100 custom sales. In mid-January, 2014, PE finally produced "its custom quotations system." Ex. 3. Only 600 custom quotations were produced, and Enzo has only been able to match 184 with sales listed on PE's sales spreadsheet. Enzo's lost profits analysis necessarily relies on identification of the product sold. Accordingly, PE's refusal or inability to identify 25% of the products it sold makes that analysis essentially impossible to carry out.[5]

The discovery violation here is straightforward. PE testified that custom quotations existed for each custom sale, yet PE only produced 184 relevant quotations for over 3,100 sales. In addition, PE sold Biotin-16-UTP as a custom product. Biotin-16-UTP is used in conjunction with Biotin-11-CTP to create an ersatz kit.[6] PE should be precluded from arguing that any custom sale made on the same date and to the same entity that purchased Biotin-11-CTP was not a sale of Biotin-16-UTP to be used in an ersatz kit, and that Enzo properly calculated its lost profits relating to custom sales. *See Great Northern Ins. Co. v. Power Cooling, Inc.*, 2007 WL 2687666, at *14 (E.D.N.Y. Sept. 10, 2007) (granting preclusion due to discovery abuses).

## II. PerkinElmer's Position

Enzo has manufactured a discovery dispute just weeks before trial to obscure its inability to establish liability and to excuse its failure to file a meaningful expert report on damages issues by the Court's deadline for opening expert reports. Nothing was willfully "destroyed" or "lost." Instead, in the ordinary course of business, a system in use from 1999 to approximately May 2003 was taken offline in 2007.[7] The underlying data in the system was preserved, but it was recently determined that the data cannot be accessed. The only information Enzo requested from that system that has not been made available is: (1) cost information of no relevance to any claim; and (2) sales and order information duplicative of information that PerkinElmer has produced from other sources. Long before the deadline for opening expert reports, PerkinElmer repeatedly offered to meet and confer regarding the evidence that Enzo believed to be "destroyed" or "lost," and even offered to discuss a reasonable stipulation that the missing cost information is consistent with existing data from a later time period, as PerkinElmer's witness testified. But Enzo refused to even discuss the subject. With respect to every other request in Enzo's confusing and misleading letter, Enzo's requests relate not to "missing" information, but to

---

[3] PerkinElmer did not produce the custom quotations until mid-January, and initially refused to produce them at all.

[4] PerkinElmer's position – that there is no other way to determine what product was sold – is simply incredible, and presumably a result of its destruction of the ERP, which could have included inventory relief records.

[5] On January 31, 2014, three months into damages discovery and one week after Enzo's damages expert reports were due, PerkinElmer produced a spreadsheet identifying the product in 202 custom sales made in 2003 and 2004. The spreadsheet does not account for the pre-May, 2003 custom sales, and contradicts PerkinElmer's testimony that the custom quotations were the only way to identify the product sold.

[6] PE only produced, in January 2014, **after** being found by Enzo in unrelated internet searches, an incriminating PowerPoint presentation from 2002 encouraging its salespeople to sell such ersatz kits. *See* PE 212935.

[7] A PerkinElmer witness mistakenly stated that the system was taken offline in 2012. PerkinElmer will serve errata in due course that reflects that it was taken offline in 2007. This change is immaterial to the issues in Enzo's letter.

untimely discovery disputes that Enzo failed to bring to the Court's attention during the fact discovery period.[8] Moreover, Enzo's requested relief is wholly disproportionate and unjustifiable for any number of reasons,[9] but most importantly because it has yet to identify *a single* customer, sale, or transaction that violated the Agreement.[10] Thus, any discussion about the extent of any adverse inferences with respect to damages is wholly premature until and unless Enzo can first identify which specific transactions it contends breached the Agreement.

**PerkinElmer's Systems:** In the 1999 to 2002 timeframe, PerkinElmer's sales and financial data system was backed up in two ways: (1) sales and order data (but not cost data) was captured in an active database called the "data warehouse;" and (2) all of the relevant financial data, including cost information, was backed up onto tapes. The system was taken offline in or about 2007, but *the whole point* of preserving the backup tapes was to be able to retrieve the data.[11] When responding to Enzo's damages discovery in 2013, PerkinElmer learned that its vendor no longer had the software necessary to access the data on the tapes. Enzo was informed of that fact on January 14, 2014. PerkinElmer has produced sales and order information for the entirety of the relevant period, *i.e.*, from 1999 to 2005, from the data warehouse, and it has also produced the requested cost information for 2002 to 2005 from a successor system.

**Cost Information:** Enzo seeks cost information for its "expert's disgorgement opinion." New York law is clear that disgorgement is not a proper remedy for a breach of contract, and Enzo has not pled a claim for unjust enrichment.[12] Enzo's other damages theories at most require *Enzo's* cost information. Further, even if Enzo could demonstrate relevance and that some remedy would be appropriate, any prejudice from "missing" information would be easily cured with an appropriate stipulation.[13] On December 18, 2013, PerkinElmer produced available cost information for 2002 to 2005 and offered to stipulate, *e.g.*, that the cost information for 1999 to 2001 would have been consistent with that later information. Although a PerkinElmer witness has testified that the cost information would be comparable (Ex. 6 (Stump Dep.) at 258:12-24), Enzo has declined to meet and confer on the issue, preferring instead to seek sanctions wildly disproportionate to the unavailable cost information.

**Invoices:** There are no "missing" invoices, because PerkinElmer's current and historical

---

[8] Fact discovery closed on January 27, expert discovery is supposed to close on February 21, and trial is set for March 18. PerkinElmer notified Enzo on January 14 that the back-up tape could not be restored, yet Enzo waited more than a month to bring the issue to the Court. Enzo's request is therefore untimely. *See Enzo v. Orchid*, No. 03 Civ. 3819 (RJS), D.I. 87 (S.D.N.Y. Apr. 16, 2013) (denying discovery extension where dispute untimely raised).

[9] Enzo seeks, *e.g.*, to strike PerkinElmer's Answer or require "disgorgement of revenues." The cases cited by Enzo do not remotely support sanctions so extreme or grossly disproportionate to any alleged harm. *See, e.g., Cristie's*, 1996 WL 660906 (S.D.N.Y. Nov. 14, 1996) (striking answer for defendant's "willful refusal" to defend case); *Great N. Ins. Co.*, 2007 WL 2687666 (E.D.N.Y. Sept. 10, 2007) (adverse inference not warranted). *Compare Slovin v. Target Corp.*, 2013 WL 840865, at *6 (S.D.N.Y. Mar. 7, 2013) (striking answer is "drastic remed[y]").

[10] *See* February 5, 2014 Letter from Jeffrey R. Mann to the Court (agreeing with PerkinElmer that Enzo's damages expert had not offered an opinion on three out of the four damages theories set forth in his report).

[11] PerkinElmer replaced its older system with a new system in May 2003, and has produced all of the requested financial data, including cost information, from May 2003 to 2005.

[12] *See, e.g., Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 269 (S.D.N.Y. 2005) ("Disgorgement of profits is not an appropriate remedy for a breach of contract."); *Ga. Malone & Co v. Rieder*, 19 N.Y.3d 511, 517 (2012); *MJM Adver., Inc. v. Panasonic Indus. Co.*, 741 N.Y.S.2d 874, 875 (N.Y. App. Div. 2002) ("cannot recover for unjust enrichment while [also] alleging the existence of an express contract covering the same subject matter.").

[13] *See Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 589 (S.D.N.Y. 2013) (appropriate remedy for lost documents should restore the prejudiced party to same position it would have been in absent discovery violation).

practice is not to make an internal copy of invoices sent to customers. (Ex. 6 at 228:16-23.) None of the inaccessible backup tapes contain copies of invoices; they only include certain sales and order information from which an invoice could be re-generated. Because sales and order information was backed up into the "data warehouse," PerkinElmer was able to produce that information to Enzo from the data warehouse. PerkinElmer's witness testified that "the information that [PE] had on the [sales] spreadsheet," *i.e.* the sales and order information produced from the data warehouse, "is essentially what you are going to see on the invoice," and is therefore duplicative. (*See id.* at 310:9-20.) Enzo claims it needs invoices (or the underlying data) to show whether certain products were sold together, but PerkinElmer has *already produced* sales and order information that shows whether or not products were sold together.[14] Enzo also complains that PerkinElmer would not agree to manually regenerate tens of thousands of invoices that do not currently exist. PerkinElmer's objection to generating new documents is proper.[15] But, in any event, the time for Enzo to compel all this discovery has long passed.

**Custom Quotations**: Enzo does not identify any information it sought in discovery that was "destroyed" or "lost." Because the custom manufacturing process was "very manual," there is no evidence that PerkinElmer systematically maintained records of what product was ordered as a custom product. (Ex. 7 (Mayer Dep.) at 64:22-67:7.) As PerkinElmer's witness testified, the best proxy for determining what was ordered would be to consult the quote given to the customer. (*Id.* at 108:24-109:3.) Enzo claims—without any basis—that this is "incredible"[16] and erroneously "presum[es]" that custom quotations were destroyed. As PerkinElmer has repeatedly stated to Enzo, PerkinElmer has produced the quotes from its custom quotation system, and there are no additional custom quotes to compel. In addition, PerkinElmer conducted a diligent search for any other information relating to custom products, and produced that information as well. Moreover, as noted above, PerkinElmer has offered to engage in a discussion about any evidentiary stipulations that might cure any specific prejudice that Enzo believes it has suffered, but Enzo has refused to engage in that discussion.[17]

**Inventory Records**: Enzo did not seek inventory records in its discovery requests (Ex. 2), nor did it ask for any such records until long after the agreed-upon date for requesting documents. Enzo's conjecture that such records may contain information regarding the identification of custom products is baseless (Ex. 6 at 67:1-7), as is the conclusory and wholly unsupported assertion that those records were "lost." In any event, the issue is irrelevant given the untimeliness of both Enzo's initial request and its efforts to raise the issue with the Court.

---

[14] Contrary to Enzo's gross mischaracterization, Ms. Mayer testified that kits and nucleotides "were separate lines on the order [and] separately invoiced as separate line items," which is consistent with Ex. 4. (Ex. 7 at 179:14-18.)

[15] 7 Moore's Federal Practice § 34.14 (3d ed. 2014) ("A document that does not exist is obviously not within the possession, custody, or control of a party. Rule 34 may not be used to require a party to prepare a writing.").

[16] Enzo's mischaracterizes the information produced. Any discrepancy between the number of custom purchases and the number of custom quotations is simple: a customer could make multiple orders based on the same quotation. PerkinElmer has repeatedly informed Enzo of this fact.

[17] Moreover, even if Enzo had identified "missing" information, it would be largely irrelevant. Enzo points to unpled claims that "custom sales were merely bulk quantities of listed products for which PE did not make payment to Enzo based upon the agreed price" and that "Biotin-16-UTP [sold] . . . with Biotin-11-CTP [was used to] create an ersatz kit" with a kit sold by *a third party*. Neither of these claims is in the Complaint. *See* Complaint ¶ 58(d)(ii) (claim that PerkinElmer "fail[ed] to remit proper payment for [kits] . . . *it [PerkinElmer]* has sold"). Contrary to Enzo's suggestion, the slides that form the basis for its new claim were produced in substantially identical fashion in 2003. *See* Dkt. No. 119 at 7 (declining to allow Enzo to amend complaint where delayed 8 years). As to Enzo's lost profits claim, as stated, Enzo has not shown a single, breaching sale for which the information would be relevant.

Respectfully submitted,

/s/ Jeffrey R. Mann
Jeffrey R. Mann
GREENBERG TRAURIG, LLP
200 Park Ave.
New York, New York 10010

/s/ William G. McElwain
William G. McElwain
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006

cc: All Counsel of Record