**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
ENZO BIOCHEM, INC. and                    :
ENZO LIFE SCIENCES, INC.                  :
                                          :
                     Plaintiffs,          :
              v.                          :     No. 03-CV-3817 (RJS)
                                          :
PERKINELMER, INC. and                     :
PERKINELMER LIFE SCIENCES, INC.,          :
                                          :
                     Defendants.          :
                                          :
---------------------------------------------------------------- x

# ENZO'S MEMORANDUM OF LAW
# IN OPPOSITION TO PERKINELMER'S *DAUBERT* MOTION TO PRECLUDE
# EXPERT TESTIMONY BY DR. DAVID SHERMAN

# TABLE OF CONTENTS

                                                                                              **Page**

I. Background .................................................................................................................. 2

II. Legal Standard ............................................................................................................. 2

III. Argument ..................................................................................................................... 4

      A. Dr. Sherman's Testimony Concerning The Contract Issue of Products "Covered By" Enzo Patents Should Be Allowed .......................................... 4

      B. Dr. Sherman's Opinions Concerning "Covered" Products Were Timely ................... 7

      C. Dr. Sherman's Opinions Relate to Enzo's Live Contract Claims ............................. 9

      D. Dr. Sherman's Remaining Opinions Are Reliable And Have A Sound Methodological Basis ................................................................................................ 9

            1. Dr. Sherman's Opinions on Commercial Use, Basic Research and Applied Research Are Admissible. .............................................. 10

            2. Dr. Sherman's Opinions on the Independent Value of Kits Absent Nucleotides Are Admissible. ....................................................... 13

            3. Dr. Sherman's Opinions on the Likely Use of Simultaneously-Purchased UTP and CTP Nucleotides Are Admissible. .................. 13

      E. Dr. Sherman Should Not Be Precluded from Offering Opinions on the Meaning of Particular Language Merely Because It Appears in the Agreement ................................................................................................................ 14

IV. Conclusion ................................................................................................................. 14

# TABLE OF AUTHORITIES

Page

**Cases**

*Aventis Environmental Science USA LP v. Scotts Co.*,
   383 F. Supp. 2d 488 (S.D.N.Y. 2005) .................................................................................. 9

*Borawick v. Shay,*
   68 F.3d 597 (2d Cir. 1995) ................................................................................................... 3

*Boucher v. United States Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996) .................................................................................................... 3

*Bunt v. Altec Indus., Inc.*,
   962 F. Supp. 313 (N.D.N.Y. 1997) ...................................................................................... 3

*Cardinal Chem. Co. v. Morton Int'l, Inc.*,
   508 U.S. 83 (1993) ............................................................................................................... 7

*Chesapeake Energy Cop v. Bank of N.Y. Mellon Trust Co.*,
   957 F. Supp. 2d 316 (S.D.N.Y. 2013) ................................................................................ 14

*Clarke v. LR Sys.*,
   219 F.Supp.2d 323 (E.D.N.Y. 2002) ................................................................................... 3

*Daubert v. Merrell Dow Pharm., Inc.,*
   509 U.S. 579 (1993) ............................................................................................................. 3

*Enzo Biochem, Inc. v. Amersham PLC,*
   No. 02 Civ. 8448, Dkt. No. 280, at 11 (Sept. 21, 2012) ..................................................... 7

*EOS Electro Optical Sys. v. DTM Corp.*,
   2002 WL 34536679 (C.D. Cal. Feb. 6, 2002) ..................................................................... 8

*George v. Celotex Corp.*,
   914 F.2d 26 (2d Cir. 1990) .................................................................................................. 4

*Greenfield v. Philles Records, Inc.*,
   98 N.Y.2d 562 (2002) .......................................................................................................... 5

*Henry v. A.B. Dick Co.*,
   224 U.S. 1 (1912) ................................................................................................................. 8

*In re Delta Airlines*, *Inc.*,
   608 F.3d 139 (2d Cir. 2010) ................................................................................................ 5

*In re Sulfuric Acid Antitrust Litig.*,
  235 F.R.D. 646 (N.D. Ill. 2006) ............................................................................................ 12

*Jang v. Boston Sci. Corp.*,
  532 F.3d 1330 (Fed. Cir. 2008) .............................................................................................. 5

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ....................................................................................................... 10, 12

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*,
  424 F.3d 195 (2d Cir. 2005) ................................................................................................... 5

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
  595 F.3d 458 (2d Cir. 2010) .............................................................................................. 5, 14

*Linde v. Arab Bank, PLC*,
  922 F. Supp. 2d 316 (E.D.N.Y. 2013) .................................................................................. 10

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp.2d 558 (S.D.N.Y. 2007) ..................................................................................... 2

*Marx & Co. v. Diner's Club, Inc.*,
  550 F.2d 505 (2d Cir. 1977) ................................................................................................. 14

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
  No. 09 Civ. 3255, 2012 WL 2568972 (S.D.N.Y. July 3, 2012) ............................................. 3

*Medtronic, Inc. v. Cardiac Pacemakers, Inc.*,
  721 F.3d 1563 (Fed. Cir. 1983) .............................................................................................. 7

*NYC Dep't of Finance v. Twin Rivers, Inc.*,
  1997 WL 299423 (S.D.N.Y. June 5, 1997) ........................................................................... 4

*Pandrol USA, LP v. Airboss Railway Prods., Inc.*,
  320 F.3d 1354 (Fed. Cir. 2003) .............................................................................................. 7

*POM Wonderful LLC v. Organic Juice USA, Inc.*,
  769 F.Supp.2d 188 (S.D.N.Y. 2011) ...................................................................................... 2

*Shaw v. E.I. DuPont de Nemours*,
  126 Vt. 206 (1967) .................................................................................................................. 8

*Travelers Prop. & Cas. Corp. v. Gen. Elec. Co.*,
  150 F. Supp. 2d 360 (D. Conn. 2001) ..................................................................................... 3

*UMG Recordings v. Lindor*,
  531 F. Supp. 2d 453 (E.D.N.Y. 2007) .................................................................................. 10

*United States v. Scop*,
    846 F.2d 135 (2d Cir. 2008) .................................................................................................. 14

*Valentin v. New York City*,
    No. 94 CV 3911(CLP), 1997 WL 33323099 (E.D.N.Y. Sept. 9, 1997) ................................... 3

**Statutes**

35 U.S.C. § 271 ............................................................................................................... 1, 7, 8

**Other Authorities**

Fed. R. Evid. 403 .................................................................................................................. 4

Fed. R. Evid. 702 ............................................................................................................. 3, 10

Moore's Fed. Practice § 134.22 [1][a] .................................................................................. 4

PerkinElmer's motion is nothing more than an untimely summary judgment motion masquerading as a *Daubert* motion. It appears that PerkinElmer's real dispute is not with the reliability of Dr. Sherman's opinions, but instead with Enzo's reading of the contract at the center of this case. What PerkinElmer is really asking is for the Court to hold that the language "covered by a claim" in the Distributorship Agreement means "*infringe a valid* claim" simply because it says so. That argument is untimely, an improper basis for a *Daubert* motion, and plainly at odds with the agreement itself and the course of performance of the parties.

As set forth generally in Enzo's Motion *In Limine* No. 1 (Dkt. No. 171), the Distributorship Agreement is unambiguous that the specific products listed in Exhibit C to the agreement are "covered by a claim" of Enzo's patents. Dr. Sherman's report was necessitated by PerkinElmer's refusal to stipulate to this basic fact—despite having **agreed** that Exhibit C products are covered by Enzo's patents when it entered into the Distributorship Agreement in order to settle any patent infringement disputes concerning those same products. Obviously, if the Court grants Enzo's Motion *In Limine* No. 1, it would largely obviate both PerkinElmer's instant motion and the need for Dr. Sherman's analysis of whether each product listed in the Distributorship Agreement is "covered by" a listed Enzo patent. If it does not, however, PerkinElmer has articulated no reason—least of all rulings by the Court related to Enzo's separately pled cause of action under 35 U.S.C. § 271—that Dr. Sherman should not testify as to his opinion on whether these products are "covered by" a claim of one or more Enzo patents. Nor should Dr. Sherman be prohibited from testifying on any other topic sought to be precluded based on this motion, including the commercial uses, research uses, and scientific value of labeled nucleotide products, as Dr. Sherman reliably applies his vast experience in both academia and industry to the facts of the instant litigation.

I.   **Background**

Enzo and PerkinElmer entered into the Distributorship Agreement and related Settlement Agreement to resolve disputes over whether particular products made and sold by PerkinElmer were infringing one or more patents owned or exclusively licensed by Enzo, and to permit PerkinElmer to make and sell those same products going forward. (Dkt. No. 171 at 3-4.) PerkinElmer freely negotiated with Enzo to enter into integrated Settlement and Distributorship Agreements with Enzo (collectively, the "Integrated Agreements") which, among other things, (1) stipulated in the Settlement Agreement that certain products "infringed" Enzo's valid and enforceable patents; (2) alternatively defined certain products as PRODUCTS falling within the scope of the Distributorship Agreement more broadly by whether they were "covered by" claims of patents in order to avoid any notion of infringement; and (3) listed those "covered by" PRODUCTS in Exhibits B and C in order to avoid doubt concerning infringement. (*See* Dkt. No. 171.) By PerkinElmer's own admission—and its usage of both terms in the Integrated Agreements, the choice of the term "covered by" (as opposed to "infringe") was no accident. PerkinElmer entered into the Distributorship Agreement precisely to ***avoid*** the type of full-blown infringement analysis by a judge or jury (claim construction, claim charts, and all) that would be necessary in a patent infringement suit.

II.  **Legal Standard**

"[T]he Federal Rules of Evidence favor the admissibility of expert testimony, and [the court's] role as gatekeeper is not intended to serve as a replacement for the adversary system." *POM Wonderful LLC v. Organic Juice USA, Inc.*, 769 F.Supp.2d 188, 197 (S.D.N.Y. 2011) (quoting *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp.2d 558, 561 (S.D.N.Y. 2007)). As such, the court's role as gatekeeper "is tempered by the liberal thrust of the Federal Rules of Evidence

and the 'presumption of admissibility.'" *Bunt v. Altec Indus., Inc.*, 962 F. Supp. 313, 317 (N.D.N.Y. 1997) (quoting *Borawick v. Shay,* 68 F.3d 597, 610 (2d Cir. 1995)). Rather than exclusion, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 596 (1993). "Indeed, most objections to expert testimony are related only to the weight of the evidence, not its admissibility." *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, No. 09 Civ. 3255, 2012 WL 2568972, at *15 (S.D.N.Y. July 3, 2012). Indeed, Fed. R. Evid. 702 broadly provides that expert testimony which is based on sufficient facts or data and is the product of reliably applied principles and methods to the facts of the case will be allowed if it "will help the trier of fact to understand the evidence or to determine a fact in issue."

"A review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." *Travelers Prop. & Cas. Corp. v. Gen. Elec. Co.*, 150 F. Supp. 2d 360, 364 (D. Conn. 2001) (quoting Advisory Committee Notes, 2000 Amendments, Fed.R.Evid. 702). Notably, "The Second Circuit's standard for admissibility of expert testimony is 'especially broad.'" *MBIA Ins. Corp.*, 2012 WL 2568972, at *15 (quoting *Clarke v. LR Sys.*, 219 F.Supp.2d 323, 332 (E.D.N.Y. 2002)). "[C]ourts have held that any doubts about whether an expert's testimony will be useful should be resolved in favor of admissibility." *Valentin v. New York City*, No. 94 CV 3911(CLP), 1997 WL 33323099, at *16 (E.D.N.Y. Sept. 9, 1997) (internal quotations omitted). It is "[o]nly if the expert testimony is so fundamentally unsupported that it cannot help the factfinder should a trial court exclude an expert opinion." *Id.* (internal quotations omitted); *see also Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (holding that

expert testimony is admissible unless purely conjectural or based on wholly unfounded assumptions)).

Rule 403 precludes expert testimony only if its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. Rule 403 "is an extraordinary remedy that must be used sparingly." *George v. Celotex Corp.*, 914 F.2d 26, 31 (2d Cir. 1990).

### III. <u>Argument</u>

#### A. Dr. Sherman's Testimony Concerning The Contract Issue of Products "Covered By" Enzo Patents Should Be Allowed

To date, PerkinElmer has maintained its illogical position that the terms of the Distributorship Agreement do not necessarily apply to Listed Products which PerkinElmer not only expressly agreed were "covered by" the contract, but also chose to identify in Exhibits to the contract. The Distributorship Agreement says "covered by," not "infringed"—a distinction in term that PerkinElmer knowingly bargained for. Contrary to PerkinElmer's suggestion, Dr. Sherman's "coverage" analysis, which included some infringement analysis to assess whether Listed Products are "covered by" the Agreement, did not magically transform an unambiguous contract term or convert Enzo's separately-pled claims for breach of contract into patent infringement claims.

PerkinElmer's suggestion that the law of the case doctrine requires preclusion of Dr. Sherman's testimony is legally deficient and lacks factual support. The law of the case doctrine "is limited to issues *actually* determined" by the Court. *NYC Dep't of Finance v. Twin Rivers, Inc.*, 1997 WL 299423, at *2 (S.D.N.Y. June 5, 1997) (emphasis added); *see also* Moore's Fed. Practice § 134.22 [1][a] ("A district court's pretrial decision does not establish the law of the case on issues that are not actually decided by the court."). Indeed, "[q]uestions that have not been decided do not become law of the case merely because they could have been decided." *Id*.

Here, the law of the case doctrine is inapplicable because the Court did not (and in fact could not) have made a determination concerning whether certain products are "covered by" claims of Enzo's patents when it has not even made a threshold ruling resolving the parties' dispute about what that contract term means. PerkinElmer cites to a single authority (*Jang v. Boston Sci. Corp.*, 532 F.3d 1330, 1331-32, 1334 n.5 (Fed. Cir. 2008)) for the proposition that the contractual term "covered by" a patent means to "infringe" that patent as a matter of law. But in *Jang*, the parties (participants in a different industry than Enzo and PerkinElmer) did not dispute this interpretation of "covered by," and thus the issue was not squarely before the Federal Circuit. Nor is it clear what state's substantive law governed the contract at issue in *Jang*, what the parties to that contract intended, what circumstances surrounded that contract, or what other language in the contract may have had bearing on the meaning (including whether that contract contained any stipulations of infringement, validity or dominance, or the disclaimer of a patent license, which seems unlikely). In any case, PerkinElmer may not rely on non-binding dicta to shortcut tried-and-true principles of contract interpretation under New York law, which governs the Distributorship Agreement.[1] PerkinElmer has not addressed these principles, nor has it proffered any evidence in support of its interpretation of "covered by." Therefore, PerkinElmer's arguments as to any interpretation of this contractual term should be rejected.

---

[1] *See, e.g.*, *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) ("agreements are construed in accord with the parties' intent"); *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) ("Evidence as to custom and usage is to be considered by the court where necessary to understand the context in with the parties have used terms that are specialized" and limited to "proof that the language in questing is fixed and invariable in the industry in question"); *id.* at 467 ("where consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity"); *In re Delta Airlines, Inc.*, 608 F.3d 139, 146 (2d Cir. 2010) (directing courts to consider "the history and education of the parties, the nature of the contract, the purposes of the parties, and all other relevant circumstances."); *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (contracts "should be construed so as to give full meaning and effect to all of its provisions").

Next, PerkinElmer misrepresents the analysis Dr. Sherman undertook in arriving at his conclusions that PerkinElmer's products were "covered by" Enzo's patents. While admittedly, Dr. Sherman's methodology employs *some* infringement analysis, he also states his use of a broader methodology, which PerkinElmer conveniently replaces with an ellipses (Dkt. No. 176 at 4):

> I have been informed that a product that would infringe a Listed Patent is necessarily "covered by a claim" of that patent, ***although a product does not necessarily have to infringe a Listed Patent to be covered by a claim of that patent.*** Therefore, for the purposes of this report, I analyze whether or not the manufacture, use, or sale of a Listed Product would infringe one or more claims of that Listed Patent.

(Ex. 1, Sherman Report ¶ 54, emphasis added to note the portion deleted by PerkinElmer in its Brief).[2] Dr. Sherman goes on to state the analysis undertaken to support his broader opinion that PerkinElmer's products are "covered by" Enzo's patents: "I find that the Listed Products are covered by one or more claims of one or more of the Listed Patent because they are covered ***by the technology described in these patents <u>and/or</u> the language of the relevant claims***." (*Id.* ¶ 55, emphasis added.)[3] His opinion is further bolstered by his general descriptions of the patents at issue in this case (*Id.* ¶¶ 44-51) as well as the general technological features of PerkinElmer's products (*id.* ¶¶ 59-66) and the general descriptions of the relevant features of the products that are applicable to each patents (*e.g.*, *id.* ¶¶ 69-71, 74-75, 78-82, 91-93, 102-105, 107-108, 110-111, 114-118.) Dr. Sherman opined that the Listed Products "are covered by, and also infringe, one or more claims of the Listed Patents," and confirmed as much during his deposition. (*Id.* ¶ 14; Ex. 2 Sherman Tr. 64:22-24 ("I mean this is what I state[,] are covered by and ***also*** infringe one or more

---

[2] All exhibits references herein are attached to the Declaration of Justin A. MacLean in Support of Enzo's Opposition to PerkinElmer's *Daubert* Motion to Preclude the Testimony of Dr. David H. Sherman, filed concurrently herewith.

[3] Unquestionably, Dr. Sherman goes on to recite a narrower analysis, applying Judge Sprizzo's constructions, and *separately* comes to the conclusion that "the same Listed Products are ***also*** covered by these constructions." (*Id.* ¶ 55 (emphasis added); *see also, e.g.*, *id.* ¶ 83, "it is my opinion that the use of the Listed Product satisfied the "A" limitation … ***including*** as construed by this Court." (emphasis added)).

-6-

claims." (emphasis added)). Again, PerkinElmer selectively quotes from Dr. Sherman's deposition (Dkt. No. 176 at 6), because his full explanation of his analysis is detrimental to its arguments.

Finally, contrary to PerkinElmer's arguments, Dr. Sherman's opinions regarding indirect detection of fluorescent dyes are fully consistent with the Court's summary judgment ruling on patent issues in September 2012. In granting summary judgment of non-infringement of the '824 and '767 patents with respect to directly detectable products, the Court held that "a device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim." *Enzo Biochem, Inc. v. Amersham PLC*, No. 02 Civ. 8448, Dkt. No. 280, at 11 (Sept. 21, 2012). As Dr. Sherman explains in his report, however, using a fluorescent dye as a hapten by introducing an anti-dye antibody is the type of "alter[ation]" contemplated by the Court that would unquestionably covered by (perhaps even "infringe") the '824 and '767 patents, and is a use that PerkinElmer's customers could make even absent PerkinElmer's directions to do so. (Ex. 1 ¶¶ 33-35, 83 & n.10.) PerkinElmer may not *itself* use or direct its customers to use its labeled nucleotides in this faction and thus might not be liable for patent infringement under 35 U.S.C. § 271. However, the language of the Distributorship Agreement does not limit itself to uses made or contemplated by PerkinElmer.[4]

### B. Dr. Sherman's Opinions Concerning "Covered" Products Were Timely

The Court did not enter a schedule for expert discovery in this case, including on the issues

---

[4] Moreover, "Supreme Court precedent and [the Federal Circuit's] cases make clear that patent infringement and patent validity are treated as separate issues." *Pandrol USA, LP v. Airboss Railway Prods., Inc.*, 320 F.3d 1354, 1364 (Fed. Cir. 2003) (citing *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83 (1993)). "Though an invalid claim cannot give rise to liability for infringement, whether it is infringed is an entirely separate question capable of determination without regard to its validity." *Id.* at 1365 (quoting *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.3d 1563, 1583 (Fed. Cir. 1983)). Here, to the extent the Court disagrees with Enzo and holds that "covered by" and "infringed" mean the same thing as a matter of law, it should clarify that Dr. Sherman is not precluded from testifying that directly-detectable products are "covered by" the '928 patent – a proposition that PE has never contested.

of liability for breach of contract and attendant damages, until November 12, 2013. (D.I. 121.) In particular, the Court's scheduling order (as extended) required the parties to serve expert reports by January 28, 2014. (D.I. 137.) Since Enzo served Dr. Sherman's report on January 28, 2014, there is no question that his opinions concerning contract matters are timely.

Nevertheless, based on the same flawed logic discussed above, PerkinElmer argues that Dr. Sherman's opinions are "untimely" because his report discusses certain PerkinElmer products that have never been accused of *infringement* under 35 U.S.C. § 271. But, it is well settled that a "breach of contract action is distinct from one for patent infringement, and may be brought even where a patent infringement suit is improper." *EOS Electro Optical Sys. v. DTM Corp.*, 2002 WL 34536679, at *7 (C.D. Cal. Feb. 6, 2002); *see also Shaw v. E.I. DuPont de Nemours*, 126 Vt. 206, 208-09 (1967) ("The rights and remedies available under the patent law are not exclusive. [Enzo] could elect to waive the patent infringement and rely on the defendant's contractual undertaking.") (citing *Henry v. A.B. Dick Co.*, 224 U.S. 1 (1912)). Dr. Sherman's report is not a report supporting Enzo's patent infringement cause of action under 35 U.S.C § 271. Rather, it focuses on the why and how of which products are "covered by" the claims of the Listed Patents in connection with Enzo's breach of contract claims, and an infringement analysis is merely part of his methodology, assuming it is needed (*see* Enzo's Motion *in Limine* No. 1). Thus, there was no need for the products to have been set forth in Enzo's infringement contentions[5] for Dr. Sherman's discussion about them to be germane to the contract dispute between the parties or for the subject matter to be timely. For the same reason, correspondence between the parties concerning which products remain subject to the patent infringement claims has no bearing on an expert opinion

---

[5] Enzo responded to ***exactly*** the question posed in PerkinElmer's March 9, 2005 Interrogatory Nos. 1 and 3 – it identified products which it "contends has infringed or infringes" under 35 U.S.C. § 271. (*See* Dkt. No. 182-4, Khan Decl. Ex. 2.1, at 1-2.)

regarding products covered by the contract. But in any case, "a challenge to the facts or data relied upon by [an expert] does not go to the admissibility of his testimony, but only to the weight of his testimony." *See Aventis Environmental Science USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 514 (S.D.N.Y. 2005)).

PerkinElmer makes no more than a passing reference to the supposed prejudice it will suffer. In fact, it is entirely unclear what PerkinElmer truly believes could be prejudicial about an expert report that provides an opinion about "coverage" of "PRODUCTS" ***expressly listed*** in a Distributorship Agreement that uses the term "covered by" and has been the subject of breach of contract claims since Day 1 of this litigation.

### C. Dr. Sherman's Opinions Relate to Enzo's Live Contract Claims

Section III of PerkinElmer's Brief does not even attempt to argue that Enzo "abandoned" its claims for breach of contract. Instead, it baselessly elevates Enzo's stipulation to dismiss its patent infringement *claims* into a so-called "abandonment" as to all claims against particular *products*. Again, PerkinElmer mischaracterizes the stipulation, which "shall not affect and/or be deemed a dismissal of any of the parties['] remaining non-patent claims" and which "does not in any way affect Plaintiffs' contract claims with regard to all Products under the DA and the related Settlement Agreement[.]" (Dkt. No. 185 ¶¶ 1-2.) But if Enzo could be said to have abandoned its patent infringement claims, which it did not, that would have no bearing on an expert analysis related to Enzo's breach of contract claims for the reasons discussed above.

### D. Dr. Sherman's Remaining Opinions Are Reliable And Have A Sound Methodological Basis

PerkinElmer faults Dr. Sherman's methodology used in forming opinions on three distinct topics: (1) the "commercial use," as distinguished from "basic research," done at pharmaceutical companies; (2) the "independent value of kits" absent their accompanying labeled nucleotides; and

(3) the likely use of UTP and CTP ribonucleotides purchased together. But, as is clear from his report and subsequent deposition, Dr. Sherman reliably applies the insights gained during the 35 years he has been employed in and consulting for industry – including pharmaceutical and biotechnology companies – as well as in academia, where he has dealt with the same issues of basic versus applied research and gained other pertinent experience. (Ex. 1 ¶¶ 6-11 and Ex. 1 thereto; Ex. 2, Sherman Tr. at, *e.g.*, 66-74, 108-110.) Basing such an opinion on such experience constitutes sufficient methodology for his opinion to be admissible. *See, e.g., Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) ("no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience"); *UMG Recordings v. Lindor*, 531 F. Supp. 2d 453, 456 (E.D.N.Y. 2007) ("experience in conjuction with other knowledge, skill, training or education may provide a sufficient foundation for expert testimony, and in certain fields experience is the predominant, if not sole, basis for a great deal of reliable expert testimony") (quoting Fed. R. Evid. 702, 2000 Amendments, Advisory Committee Notes) (alterations omitted).

### 1. Dr. Sherman's Opinions on Commercial Use, Basic Research and Applied Research Are Admissible.

Dr. Sherman should not be precluded from testifying that pharmaceutical and biotechnology companies only used labeled nucleotides for commercial use, and not for basic research. PerkinElmer faults Dr. Sherman for failing to cite to documents or testimony for his opinions. But Dr. Sherman is not required to do so for his opinions to be admissible. *See Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 321 (E.D.N.Y. 2013) ("Lack of textual authority in support of an expert's opinion goes to the weight, not the admissibility, of the testimony."). Rather, Dr. Sherman bases his opinion as to the activities constituting "basic research," "applied research," and "commercial use" (as those terms are understood by a scientist of ordinary skill in the art) on his

experience in the field (Ex. 1 ¶ 43), which, as discussed above, is highly sound and related to the facts of this case.

It is of no importance that Dr. Sherman's opinions and the methodology behind them as to these terms and their applicability to academia and commercial industries were expressed in a single paragraph in his report. (*Id.*) PerkinElmer was on notice of the substance and basis of those opinions. In fact, PerkinElmer took the opportunity to question him about it for several hours during his March 2, 2014 deposition.[6] During that deposition, Dr. Sherman was specifically asked to expound upon the opinions and methodology in Paragraph 43 of his report, including: (i) his personal involvement with various types of agreements (Ex. 2, Sherman Tr. at, *e.g.*, 13-19); (ii) the terminology used in the agreements he has been involved with—including "research use," "commercial use," "commercial development," and "commercial exploitation" (*id.* at 19-24); (iii) the "profit motive" methodology he uses for determining whether companies do basic or applied research (*id.* at, *e.g.*, 74-83), and the contrasting motives for academic researchers at universities (*id.* at 83-87); (iv) the "clear delineation" between basic and applied research at universities, and the "proper channels" to take profit-motivated research outside of the universities (*id.* at 87-94); (v) Dr. Sherman's personal experience in setting up startup companies to take his own applied research out of the university setting (*id.* at 108-113); and (vi) his views on deposition exhibits purporting to show that commercial entities engage in "basic research" – and his considered rebuttals to those documents (*id.* at 114-144).[7] As one court has aptly stated, "[t]his kind of responsive testimony is not the kind of ambush with an undisclosed opinion that the disclosure

---

[6] In fact, of the 230 pages of Dr. Sherman's deposition transcript containing substantive testimony, 116 of those pages were dedicated to his experience with, use and understanding of this terminology. Given the Court's rules requiring excerpts of deposition testimony, Enzo has not provided the entire transcript, but would pleased to do so if it would be helpful to the Court.
[7] It goes without saying that the fact that certain documents appear to express opinions that contradict Dr. Sherman's go to the weight of his opinion, not its admissibility.

rules were designed to prevent." *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 659-660 (N.D. Ill. 2006); *see also id.* at 660 ("If you decide to take an expert deposition, you must be careful what you ask.").

Just because PerkinElmer did not like the answers that Dr. Sherman gave does not mean that his testimony is inadmissible or that he did not employ any methodology. The methodology he used was simply an application of his vast experience to the terms and issues at hand; this is perfectly acceptable. *See Kumho Tire*, 526 U.S. at 147 ("no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience"). Moreover, Dr. Sherman's opinions – that *all* pharmaceutical or biotechnology companies perform "applied research" or "commercial use" – do not run afoul of any holdings of this Court. In fact, this analysis was specifically condoned by the Court's October 28, 2013 ruling denying summary judgment, where the Court cited with approval an exhibit merely "documenting PerkinElmer sales to, among others, Abbott Labs, AstraZeneca, Bayer, Bristol-Myers Squibb, Eli Lilly, Genentech, GlaxoSmithKline, Merck, Motorola, Pfizer, Quest Diagnostics, Roche, Sanofi Aventis, Schering, and Wyeth" as affirmative evidence that, if Enzo's position is accepted by the jury, PerkinElmer breached the agreement. (Dkt. No. 119 at 4-5.)[8] At worst, Dr. Sherman's opinions merely confirm the arguments that **PerkinElmer itself** made on summary judgment: that "product development" —i.e., non-basic research—is "the ***only type of research in which commercial entities engage***." (*See* Mem. of Law in Support of PerkinElmer's Motion for Summary Judgment, Dec. 21, 2012, at 8 (emphasis added).)

---

[8] The transcript citations to which PE refers appear to reference hypothetical situations, backed by no evidence one way or another, designed to test whether the terms of the Agreement prohibited sales to commercial entities generally – not whether a jury could reasonably infer that a sale to a commercial entity was, absent the safeguards specified in the Agreement, made for a non-research use and/or for commercial exploitation (i.e., applied research).

### 2. Dr. Sherman's Opinions on the Independent Value of Kits Absent Nucleotides Are Admissible.

In arguing that Dr. Sherman's opinions as to the "value" of kits (Ex. 1 ¶ 59) is inadmissible, PerkinElmer misses the point entirely. Dr. Sherman does not opine as to the *financial or economic* value of PerkinElmer kits without the nucleotides. Rather, Dr. Sherman states in his report that he looked at particular kits *for making labeled probes*, listed on Exhibit C to the Agreement, and concluded that without the labeled nucleotides, they would have "no value to me as a scientist. I'm not opining on economic terms. I'm opining on scientific value." (Ex. 2, Sherman Tr. 212:5-9.) In contrast, Dr. Sherman concludes that "the nucleotides are … really the critical piece of the kit. The rest of it can be deconstructed and used, buffers developed, and the enzyme can be … purchased and so on." (*Id.* 212:24-213:4.) Because Dr. Sherman does not opine on economic value and will not do so at trial, this portion of PerkinElmer's motion appears to be moot.

### 3. Dr. Sherman's Opinions on the Likely Use of Simultaneously-Purchased UTP and CTP Nucleotides Are Admissible.

PerkinElmer mischaracterizes the basis for Dr. Sherman's opinion with respect to simultaneous purchases of UTP and CTP ribonucleotides from PerkinElmer. As stated in his report, his opinion is based on his understanding as to PerkinElmer's "*technical* and marketing efforts" PerkinElmer made to persuade Enzo kit customers using Affymetrix microarrays to switch to a combination of PerkinElmer and Ambion components, as well as his understanding that Affymetrix microarrays "have been a popular application for using labeled nucleotides." (Ex. 1 ¶ 66 n.8.) Further, at deposition, Dr. Sherman confirmed his understanding that the "primary value" of these nucleotides was in Affymetrix arrays. (Ex. 2, Sherman Tr. 214:22:-216:6.) While Dr. Sherman does not recite the basis for his opinions using the magic incantation, "based on my 35 years of experience in the field," it is clear that those years of highly relevant experience form the

basis for his conclusion in footnote 8 of his report. For this reason, Dr. Sherman's opinion on simultaneous UTP and CTP purchases should not be precluded.

### E. Dr. Sherman Should Not Be Precluded from Offering Opinions on the Meaning of Particular Language Merely Because It Appears in the Agreement

Part V of PerkinElmer's *Daubert* motion is somewhat unclear. Of course, Dr. Sherman is not an attorney (Ex. 1 ¶ 14) and will not offer any opinions in the form of *legal conclusions* that the contract should be interpreted so as to permit or prohibit particular conduct. Indeed, Enzo acknowledges that such an opinion would invade the court's authority to instruct the jury on the applicable law. *See, e.g.*, *United States v. Scop*, 846 F.2d 135, 139-40 (2d Cir. 2008); *Marx & Co. v. Diner's Club, Inc.*, 550 F.2d 505, 509-511 (2d Cir. 1977). However, PerkinElmer may also be arguing that Dr. Sherman should be precluded from testifying as to the meaning of particular words and phrases, which may then inform the Court's or the jury's interpretation of relevant contractual terms. *See, e.g.*, *Law Debenture Trust*, 595 F.3d at 466 (custom and usage considered to determine unambiguous meaning of contractual term); *Chesapeake Energy Cop v. Bank of N.Y. Mellon Trust Co.*, 957 F. Supp. 2d 316, 332 (S.D.N.Y. 2013) (industry custom and practice considered as extrinsic evidence of parties' intent). As discussed above, Dr. Sherman has the experience to do so and has reliably applied that experience to the terms at issue in this case. Any such testimony, therefore, should not be precluded.

## IV. Conclusion

For the foregoing reasons, Enzo respectfully requests that the Court deny PerkinElmer's motion to exclude Dr. Sherman's testimony in its entirety.

Dated: March 7, 2014

                              **GREENBERG TRAURIG, LLP**

                              By: /s/ Justin A. MacLean

                              Ronald Lefton (LeftonR@gtlaw.com)
                              Jeffrey Mann (MannJ@gtlaw.com)
                              Roy Taub (TaubR@gtlaw.com)
                              John Elliott (ElliottJ@gtlaw.com)
                              Justin MacLean (MacLeanJ@gtlaw.com)

                              200 Park Avenue
                              New York, New York 10166
                              (212) 801-9200

                              *Attorneys for Plaintiffs Enzo Biochem, Inc.*
                              *and Enzo Life Sciences, Inc.*