UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ENZO BIOCHEM, INC. and<br>ENZO LIFE SCIENCES, INC.,<br><br>                      Plaintiffs,<br>      v.<br><br>PERKINELMER, INC., and<br>PERKINELMER LIFE SCIENCES, INC.,<br><br>                      Defendants,<br>and,<br><br>YALE UNIVERSITY,<br>                      Nominal Defendant. | Civil Action No. 03-cv-03817<br>(JES) |

**DECLARATION OF GREGORY K. BELL, PH.D.**

**MARCH 7, 2014**

I, GREGORY K. BELL, hereby declare, under penalty of perjury that the foregoing is true and correct:

1. On January 28, 2014, I submitted an expert report ("Bell Report") in this matter. Prior to submitting this report, it was my understanding that the PerkinElmer information required for my damages analysis would be produced in time to present a complete estimate of alleged damages in the Bell Report. Once it became apparent that sufficient information would not be produced in time to complete my analysis of alleged damages, I used the Bell Report to articulate my methodologies for estimating the damages sustained by Enzo due to the alleged breaches of the Distributorship Agreement by PerkinElmer. I also articulated the reasons why it was neither practical nor possible to implement those methodologies at that time, given then ongoing and imminent discovery related to a number of issues.[1]

2. On February 27, 2014, I submitted a supplemental expert report ("Bell Supplemental"). In the Bell Supplemental, I implemented the damages methodologies articulated in the Bell Report to the extent possible, using discovery information which was produced proximate to or subsequent to the Bell Report. As noted in the Bell Supplemental, notable deficiencies in the production continued to impede my analysis, leading to a conservative estimate of damages.[2]

3. The discovery that was ongoing proximate to or subsequent to the Bell Report included the following items.

    (a) Stump Deposition, January 25, 2014. Prior to this deposition, it was not apparent which of two spreadsheets of PerkinElmer sales (PE200000-5981 or PE206391) was the correct one for analysis, or which columns of these spreadsheets

---

[1] Bell Report, ¶¶ 6-7, 26-27, 32, 34, 36, 40, 44, 49, 54, and 56.
[2] Bell Supplemental, ¶ 15.

2

contained the appropriate data.[3] As a result, I was unable to determine which were the top 100 PerkinElmer customers or which were the top 15 products for consideration.[4] In addition, the Stump Deposition indicated that PerkinElmer was not able to produce (or at least had not produced) cost information in order to assess disgorgement. Accordingly, I used an estimate (which I believed overstates the actual cost of production) in the Bell Supplemental in order to estimate disgorgement.[5]

(b) Mayer Deposition, January 24, 2014. The Mayer Deposition provided information essential to the characterization of the alleged damages issues with respect to the sale of ersatz kits and the use of the custom label. The Bell Report includes some discussion of the Mayer Deposition,[6] but there was insufficient time between the date of the Mayer Deposition and the date of the Bell Report to estimate the related damages, to the extent an estimate has been possible. The Bell Supplemental provides an estimate of the damages related to the sale of ersatz kits, but this estimate is incomplete due to the lack of adequate production from PerkinElmer regarding the sale of custom-labeled Product.[7] In addition, I remain unable to provide a complete estimate of the alleged damages related to the sale of custom-labeled Product to the extent that such sales were bulk sales that intentionally obscured the use of price discounts and thereby avoided transfer price payments.[8]

---

[3] These were both large files. PE200000-5981 contained approximately 79,175 lines of data in 27 columns and PE206391 contained approximately 73,556 lines of data in 30 columns. Stump Deposition, p. 126, is necessary to identify the column entitled "SUM(A.NET_SALE_AVGRATE)" of PE206391 as the right data to use for PerkinElmer sales of the products at issue, as opposed to columns entitled "SUM(A.NET_SALE_AMT)" and SUM(A.NET_BASE_AMT) in PE206391 or "SUM(A.LINE_TOTAL_PRICE)," "SUM(A.LINE_TOTAL_PRICE_USD)," or "SUM(A.LINE_TOTAL_PRICE_FUN)" in PE200000-PE205981.

[4] Bell Supplemental, ¶¶ 3, 7-10, 15, Schedules C, E-G.

[5] Bell Supplemental, ¶¶ 17, Schedule F.

[6] Bell Report, ¶¶ 45-46, 53.

[7] Bell Supplemental, ¶¶ 18-24, Schedule G.

[8] Bell Report, ¶¶ 53-56; Bell Supplemental, ¶¶ 25-29.

3

(c) Godwin Deposition, February 5, 2014. It is my understanding that this deposition clarified the extent to which PerkinElmer's sales to Amersham were to be characterized as sales that violated the research use provision of the Distributorship Agreement. In addition, on February 7, 2014, subsequent to the Godwin deposition, Amersham produced additional documents including, for the first time, a useable Excel spreadsheet of its sales.

(d) Dimond Deposition, January 24, 2014. It is my understanding that this deposition clarified the extent to which PerkinElmer's sales to Promega were to be characterized as sales that violated the research use provision of the Distributorship Agreement.[9]

(e) I understand that information regarding Promega sales (HCAEO PE Purchasing Records) was not received by Enzo's counsel until January 17, 2014. This information could not be conclusively relied upon or interpreted until the Dimond Deposition, which, as noted above, was held on January 24, 2014. As indicated in the Bell Supplemental, all PerkinElmer sales of Fluorescein 12-dUTP to Promega are alleged to be sales that violate the research use restriction.[10] Unfortunately, many of the PerkinElmer sales to Promega were for custom-labeled Product. Accordingly, I rely on HCAEO PE Purchasing Records and the Dimond Deposition to determine the total unit volume of PerkinElmer sales of Fluorescein 12-dUTP to Promega during the time period at issue.

(f) I understand that additional information regarding the custom-labeled Product sales was made available to Enzo's counsel on January 15, 2014, with the production of PE206410, and on January 31, 2014, with the production of PE230424. It was anticipated by counsel for Enzo that these files would contain sufficient information to determine which products were sold as custom-labeled Product and in what volume. Unfortunately, as indicated in the Bell Supplemental, these files did not provide adequate information in order to

---

[9] Bell Supplemental, ¶ 9.
[10] Bell Supplemental, ¶9, fn. 14.

complete an estimate of damages with respect to PerkinElmer's alleged inappropriate use of the custom label.[11]

(g) I understand that Molecular Probes did not produce documents until earlier this week, following the granting of a motion to compel that production. Those documents, which could not be reviewed for the Bell Supplemental, may contain information regarding Molecular Probe purchases from Perkin Elmer of custom and bulk products that may inform the calculation of Enzo's damages arising from those transactions that could not be supplied by PerkinElmer.

4. With respect to particular calculations in the Bell Supplemental, I note the following.

(a) Schedule C was not possible to be completed before the Stump Deposition on January 25, 2014. As noted above, the Stump Deposition identified the appropriate data reference to use for the analysis and determination of the top PerkinElmer customers in order to assess the PerkinElmer sales assumed to be in breach of the research use restriction of the Distributorship Agreement.

(b) Schedule E was not possible to be completed before the Stump Deposition on January 25, 2014; the Godwin Deposition on February 5, 2014; the Dimond Deposition on January 24, 2014; the information regarding Molecular Probe sales for 2004 (MPI-PE0000001.xls) received on January 17, 2014; and the information regarding Promega sales (HCAEO PE Purchasing Records) received on January 17, 2014, as these all provide product, sales, and cost information analyzed in the Schedule. I note that due to the lack of production by PerkinElmer regarding the type and volume of products sold under the custom label, the estimate of alleged lost profits presented in Schedule E is understated.[12]

(c) Schedule F was not possible to be completed before the Stump Deposition on January 25, 2014; the Godwin Deposition on February 5, 2014; the Dimond Deposition on January 24, 2014; the information regarding Molecular Probe sales

---

[11] Bell Supplemental, ¶¶ 26-29
[12] Bell Supplemental, ¶¶ 14-15.

for 2004 (MPI-PE0000001.xls) received on January 17, 2014; and the information regarding Promega sales (HCAEO PE Purchasing Records) received on January 17, 2014, as these all provide product sales information analyzed in the Schedule. I note that due to the lack of production by PerkinElmer with respect to the manufacturing costs of custom-labeled Product, I believe that the estimate of alleged disgorgement presented in Schedule F understates the actual amount of incremental profits realized by PerkinElmer with respect to the sales at issue.[13]

(d) Schedule G was not possible to be completed before the Stump Deposition on January 25, 2014, and the Mayer Deposition on January 24, 2014, as these data allowed identification of kit sales analyzed in the Schedule. I note that due to the lack of production by PerkinElmer regarding the type and volume of products sold under the custom label, the estimate of alleged damages presented in Schedule G is understated.[14]

(e) As discussed in the Bell Supplemental, I remain unable to estimate alleged damages due to the inappropriate use of the custom label so as to avoid transfer price payments on the bulk sale of Exhibit C Products offered at a discount.[15] PE206410, produced on January 15, 2014, and PE230424, produced on January 31, 2014, did not provide the expected information in order to determine the type and volume of Product sold under the custom label.

5. The Bell Supplemental was informed by the Azarani Evaluation, which draws conclusions regarding the likelihood of basic research or applied research being conducted by companies comprising the top 100 customers of PerkinElmer. The Azarani Evaluation was prepared at my request on or about February 4, 2014,[16] as an input to assist me in estimating Enzo's damages arising from PerkinElmer's breaches of the Distributorship Agreement. I requested that she evaluate whether customers of

---

[13] Bell Supplemental, ¶¶ 16-17, fn. 3, 27.
[14] Bell Supplemental, ¶¶ 18-24, fn. 3-5.
[15] Bell Supplemental, ¶¶ 3, 25-26, 29, fn. 4.
[16] My request was made because I understood that the information requested by subpoena from numerous third party customers of PerkinElmer was not forthcoming.

PerkinElmer and its sub-distributors of products constituting or incorporating Exhibit C Products likely would have been using the products for research use only in the research market. In preparing the Bell Supplemental, I understood the Azarani Evaluation would include customers who might engage in some small amounts of basic research, but would exclude those whose research was predominantly basic research. A draft of the Azarani Evaluation (not the final version) was received late February 19, 2014; this was the first time anyone on my team had seen a version of the Azarani Evaluation. One week later, on February 26, 2014, I received the final version of the Azarani Evaluation; I understand counsel for PerkinElmer received the Azarani Evaluation on that same day.

6. My ability to complete the Bell Supplemental prior to February 27, 2014, was curtailed by other litigation commitments that were made prior to January 28, 2014, in expectation of having completed the Bell Report on that date, including a full assessment of alleged damages. First, I note that family commitments precluded my ability to work on the Bell Supplemental prior to February 3, 2014. On February 3, 2014, I was required to attend trial preparation in Washington, DC, for another matter; I was required to attend a testimony preparation session in Switzerland for an arbitration in Japan on February 6, 2014; I was required for a deposition in Washington, DC, on February 10-11, 2014 for a third separate matter; and I was required to attend for trial testimony in New York State Court on February 17-20 on a fourth separate matter. Nonetheless, the project team working at my direction on this engagement was engaged in the analysis outlined in the Bell Report and presented in the Bell Supplemental from February 3-27, 2014.

Gregory K. Bell
March 7, 2014